UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| JOHN R. LAYTON, | ) |
| | ) |
| *Layton*, | ) |
| | ) |
| v. | ) |
| | ) |
| DEUTSCHE INVESTMENT MANAGEMENT | ) |
| AMERICAS, INC. | ) |
| | ) |
| *Defendant*. | ) |

_____)

CIVIL ACTION
NO. 04-10500-EFH

## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

The defendant, Deutsche Investment Management Americas, Inc. ("DIMA"), hereby submits the following Memorandum of Law in Support of its Motion for Summary Judgment in the above-captioned matter. As discussed more fully herein, the undisputed facts[1] establish that DIMA is entitled to summary judgment as to all claims asserted by the plaintiff, John Layton.

## PRELIMINARY STATEMENT

Plaintiff John Layton was one of nine Investment Advisors terminated from employment on November 19, 2002, in connection with a workforce reduction within DIMA's Investment Advisory Division. At the time of his termination, Layton was 48 years old. DIMA offered Layton a Separation Package that included, among other things, a Special Performance Incentive award of $244,014, provided that Layton sign a proposed letter-agreement. The letter-agreement included an Exhibit A listing the job titles and ages of employees in the Investment Advisory

---

[1] Citations herein are to the Defendant's Statement of Material Undisputed Facts ("SUF").

Division who had and had not been selected for termination ("OWBPA List").[2]    The proposed

letter-agreement called for Layton to release all claims and refrain from soliciting DIMA

employees or clients for a period of one year.  Layton signed and returned the letter-agreement

only after altering its terms by crossing out the non-solicitation provisions.  DIMA rejected these

changes.

 In his Complaint, Layton asserts four separate causes of action:  (1) that his termination

was motivated by age in violation of the Age Discrimination in Employment Act ("ADEA"), (2)

that DIMA violated the implied covenant of good faith and fair dealing, (3) that DIMA breached

the letter-agreement by not paying Layton the Special Performance Incentive award, and (4) that

DIMA committed negligent or fraudulent misrepresentation by misstating the number and ages

of employees who had been terminated.

 DIMA contends that the undisputed facts reveal that there are no genuine issues of

material fact and that DIMA is entitled to judgment in its favor as a matter of law on the

following grounds: (1) Layton cannot produce sufficient evidence to establish that DIMA's

decision to terminate his employment was motivated by a discriminatory animus on the basis of

age; (2) Layton fails to state a claim for breach of the implied covenant of good faith and fair

dealing under Massachusetts law; (3) Layton cannot assert a claim for breach of contract because

he never accepted the terms of the letter-agreement as offered; and (4) Layton cannot establish a

claim for negligent or fraudulent misrepresentation because, as he did not accept the terms of the

letter-agreement, he could not have relied on the alleged misrepresentations.  For these reasons,

---

[2] Pursuant to the Older Workers Benefits Protection Act ("OWBPA"), the provision of such a list is a prerequisite to obtaining a valid release of age discrimination claims under federal law.

BOST_187580.3

explained more fully herein, DIMA urges this Court to grant its Motion, enter judgment in its favor, and dismiss Layton's Complaint in its entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

*Acquisition of Scudder by DIMA*

Layton began working as an Investment Advisor in the Boston office of Zurich Scudder Investments, Inc. ("Scudder"), or its predecessors, on September 26, 1994.  On April 8, 2002, Deutsche Bank acquired Scudder and, as a result, Layton became an employee of DIMA.  At the time of the transaction, Layton held the corporate title of Managing Director, though his functional responsibility remained that of an Investment Advisor.  (SUF ¶¶ 2-4.)

Among its array of financial services, DIMA offers investment management services to high net worth individuals through its Private Wealth Management ("PWM") organization. PWM is divided into several distinct internal groups, including the Investment Advisory Division in which Layton worked as an Investment Advisor.  (SUF ¶ 6.)

G. West Saltonstall, who had also been a Managing Director in Scudder's Boston office, became one of the Regional Managers within the Investment Advisory Division following the acquisition by DIMA.  In that role, he was responsible for supervising Layton and the other Investment Advisors in the Boston office.  Saltonstall, whose date of birth is January 22, 1944, is ten years older than Layton.  (SUF ¶¶ 7-8.)

Saltonstall was also designated to chair the Investment Management Committee ("IMC"), which was comprised of other Regional Managers within the Investment Advisory Division, as well as the Division's Business Manager, Kurt Miscinski.  Gloria Nelund, then head of sales and marketing for PWM, also attended IMC meetings. (SUF ¶¶ 9.)

3

*Plaintiff's Negative Attitude Towards the Acquisition of Scudder by DIMA*

At the time of the Scudder acquisition by DIMA and continuing throughout his tenure at DIMA, Layton openly expressed to Saltonstall and other colleagues his unhappiness about being part of DIMA, and his opinion that the Scudder business could not succeed within Deutsche Bank. (SUF ¶ 10.)

Other factors contributed to the impression that Plaintiff was uninterested in remaining at DIMA. At the time of the Scudder acquisition, DIMA offered a special performance incentive award to a select group of employees within the Investment Advisory Division, including Layton. The award, as described in a letter to Layton dated April 1, 2002, would consist of cash and equity to be made on or before October 14, 2003. According to the letter, Layton would have to be actively employed by DIMA on the date of payment in order to be eligible for the award. The letter further required Layton to agree that he would "return any and all information relating to clients and employees of Deutsche Bank" should he terminate his employment for any reason. Layton, however, never signed and returned the April 1, 2002 letter. (SUF ¶¶ 11-12.)

Layton's refusal to sign an acknowledgment regarding his obligations under the Code of Ethics also contributed to the perception among senior management that Layton was not committed to staying at DIMA. In May 2002, Plaintiff and other employees had been asked to read and acknowledge their obligations under the Code of Ethics, which included a provision that would preclude Layton from soliciting DIMA's customers or employees for a period of one-year following his termination. On May 13, 2002, Plaintiff sent an e-mail to DIMA officials stating his refusal to be bound by the nonsolicitiation provisions of the Code of Ethics. (SUF ¶ 14.)

BOST_187580.3

DIMA management was also aware that Layton was actively seeking other employment opportunities. Beginning in the spring or early summer of 2002, Layton interviewed with Lee Munder Capital Group ("LMCG") regarding the possibility of leaving DIMA to work there. These communications culminated with LMCG extending an employment offer to Layton and two other DIMA employees from the Boston office, Deborah Moses and Roy Duke. Because the offer was conditioned on acceptance by all three of these individuals, it was ultimately withdrawn once Moses decided to reject it and stay with DIMA. (SUF ¶¶ 15-16.)

Layton also interviewed with Stein Roe Investment Counsel in mid-2002 regarding the possibility of employment there. In addition, Layton testified at his deposition that he believes he may have interviewed for a position at Brown Brothers Harriman during that period. (SUF ¶¶ 17-18.)

During the time that Layton was employed by DIMA, he experienced a high volume of net outflows of assets from his accounts, as well as a number of client terminations, which both contributed to loss in revenues. In addition, following DIMA's acquisition of Scudder, Saltonstall received complaints from several of Layton's clients, and DIMA was threatened with a lawsuit by another of Layton's clients. (SUF ¶¶ 19-20.)

*DIMA's Decision to Reduce Number of Employees in Investment Advisory Decision*

In the late summer of 2002, it became apparent that PWM was not going to meet its financial plans for the year and that PWM, as then constructed, would have difficulty meeting its objectives in future years. Consequently, DIMA determined that it needed to reduce expenses in PWM. As part of its cost reduction effort, DIMA decided to eliminate positions in the Investment Advisory Division, thereby saving compensation and benefits costs. (SUF ¶¶ 21-22.)

BOST_187580.3

On September 11, 2002, Leo Grohowski, who was then the Chief Investment Officer for PWM, wrote an e-mail to members of the IMC, instructing them to develop a plan to reduce head count in the Investment Advisory Division by $2.5 million and to have a recommendation to him by the end of the month.  (SUF ¶ 23.)

*Selection of Layton for Termination*

In developing a plan to reduce head count, the IMC determined that the Boston office could withstand a reduction in its complement of Investment Advisors because it had excess investment-advisory capacity relative to its generation of new business.  The IMC reviewed extensive statistical information about each Investment Advisor, and relied on input from the Regional Managers who were most familiar with the individuals from the various offices.  (SUF ¶¶ 24-25.)

Over the course of a few weeks, the IMC generated and revised several lists of possible terminations.  The earliest versions of the possible termination list included only more junior, lower-paid Investment Advisors.  When it became clear that this approach would not yield sufficient savings, the IMC began to give greater consideration to the more highly paid Investment Advisors who held the position of Managing Director.  A draft termination list from October 21, 2002 included three Investment Advisors from Boston, all below the level of Managing Director:  Vice President Edward Bliss (age 71), Vice President Eileen Buckley (age 49), and Leonard Dolan (age 36).  (SUF ¶¶ 26-28.)

Saltonstall recommended to the IMC that Layton be added to the termination list for a number of reasons, including but not limited to:

- Layton's termination would result in significant cost savings, as he was far more highly paid than the lower-level Investment Consultants on the earlier draft lists.
- Layton had been extremely vocal about his negative outlook towards DIMA and the efforts to integrate the Scudder and DIMA organizations.

6

- Layton had attempted to leave DIMA for LMCG earlier in the year and Saltonstall believed that would leave DIMA at the next available opportunity.

- Saltonstall did not believe that Layton would be able to take significant business away from DIMA.

- Layton had experienced a high volume of net outflows of assets from his accounts, as well as a number of client terminations, which both contributed to loss in revenues.

- Saltonstall had received recent complaints from several of Layton's clients, and DIMA was being threatened with a lawsuit by another of Layton's clients.

Based upon Saltonstall's recommendations, sometime after October 21, 2002, Bliss and Dolan were removed from the list and Layton was added.  (SUF ¶¶ 29-30.)

At some point during the time that the IMC was working on its plan to reduce head count, Saltonstall forwarded to Gloria Nelund a note that Saltonstall had received from Investment Advisor Leonard Dolan entitled "9 Reasons to Keep Me."  In an apparent attempt to be humorous, Dolan listed nine reasons why he should not be terminated, including "Youngest in Boston – by almost 10 years."  Dolan was not a member of the IMC and there is no evidence that his note was considered by the IMC in making its decisions.  (SUF ¶ 31.)

On November 19, 2002, Saltonstall and David Denaro, who was then a Senior Human Resources Advisor working in DIMA's Boston office, met with Layton to inform him that his employment would be terminated effective November 29, 2002.    (SUF ¶ 32.)

*Separation Package Offered by DIMA*

At the termination meeting on November 19, 2002, Saltonstall and Denaro presented Layton with a memorandum and proposed letter-agreement describing a "Separation Package" offered by DIMA.  The letter-agreement the OWBPA List of job titles and ages of employees in the Investment Advisory Division who had and had not been selected for termination.  (SUF ¶ 33.)

7

Under the Separation Package, Layton received a severance payment of $213,687.00, representing twenty-seven weeks of compensation. There is no dispute that DIMA made this severance payment to Layton. (SUF ¶ 34.) As part of the Separation Package, DIMA offered Layton an *additional* $244,014.00 as a Special Performance Incentive award similar to that described in April 1, 2002 letter that Layton had never accepted. Payment of this Special Performance Incentive Award was contingent on Layton signing the letter-agreement, which included a release of claims. The letter-agreement also contained provisions that would have prohibited Layton from soliciting employees and existing or prospective clients of DIMA for one year following his termination date. Layton understood that he was not entitled to receive the $244,014.00 Special Performance Incentive award unless he signed the letter-agreement. (SUF ¶¶ 35-36.)

### *Plaintiff's Response to the Letter Agreement*

On November 23, 2002, just a few days after learning of his termination <u>and while still an employee of DIMA</u>, Layton sent letters to approximately 500 of his client contacts to inform them of his departure from DIMA. Given that Layton had already solicited customers in violation of the proposed letter-agreement, Denaro informed Layton that DIMA's offer of the Special Performance Incentive award would be withdrawn. (SUF ¶¶ 37-38.)

Layton crossed out the non-solicitation provisions of the letter-agreement, signed it "as amended," and mailed it to DIMA on or about December 31, 2002. DIMA did not accept this counteroffer. (SUF ¶ 39.)

Layton sent another letter to his client contacts on January 3, 2003 to announce that he had accepted a new position with LMCG. (SUF ¶ 40.)

BOST_187580.3

*Ages of Individuals Terminated and Retained During Reduction in Force*

Of the nine individuals terminated from the Investment Advisory Division November 19, five were younger than Layton, and three of the five were under the age of forty. The two Managing Directors who were retained in the Boston office – Saltonstall (age 58) and Moses (51) – were older than Plaintiff. Edward Bliss, whose name was deleted from the termination list at around the time that Layton's was added, was 70 years old. The other Investment Advisors retained within the Boston office had the following ages: Samuel Perry (age 59); Susan Martland (53), Jonathan Treat (age 51), and Leonard Dolan (age 35). (SUF ¶¶ 41-42.)

*Reallocation of Accounts Serviced by Plaintiff*

Following Layton's termination, Saltonstall reallocated the accounts Layton had serviced to other Investment Advisors in the Boston Office: Jonathan Treat (age 51), Susan Martland (age 53), Leonard Dolan (age 35), and Samuel Perry (age 59). A small number of Layton's former accounts were assigned to Director Ronald Bates (age 40) in the Cincinnati office, Vice President Monika Panger (age 43) in the Philadelphia office, Vice President John Heldman (age 44) in the Costa Mesa office, and Director Douglas Nardi (age 38) in the Chicago office. A few of Layton's smallest accounts were transferred to the Structured Portfolio Management Group ("SPMG"), a new group established within the Investment Advisory Division in late 2002 to centrally manage relatively small-value client accounts. (SUF ¶¶ 43-45.)

*Procedural Background*

On September 15, 2003, Layton filed a charge with the Equal Employment Opportunity Commission ("EEOC") in which he alleged that DIMA had discriminated against him on the basis of his age. The EEOC issued a Notice of Dismissal of Layton's charge on December 18, 2003 on the grounds that "the evidence fails to indicate that a violation of the law occurred and it

BOST_187580.3

is not likely that additional investigation will result in our finding of a violation." (SUF ¶¶ 46-47.)

## **ARGUMENT**

### I.   LAYTON CANNOT ESTABLISH A CLAIM OF AGE DISCRIMINATION

Where, as here, there is no direct evidence of age discrimination, courts apply the familiar McDonnell Douglas-Burdine-Hicks burden-shifting framework. Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003). Under this framework, Layton bears the initial burden of establish a *prima facie* case of discrimination on the basis of age and in the context of a reduction in force by showing that: (1) he is at least forty years old; (2) he performed the position at an acceptable level; (3) he experienced an adverse employment action; and, (4) DIMA did not treat age neutrally or that younger persons were retained in the same position. See Cruz-Ramos v. Puerto Rico Sun Oil Co., 202 F.3d 381, 384 (1st Cir. 2000); Hildago v. Overseas Condado Ins. Agencies, Inc., 120 F.3d 328, 332-33 (1st Cir. 1997); LeBlanc v. Great American Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993). If Layton succeeds in satisfying these elements, the burden shifts to DIMA to articulate a legitimate, non-discriminatory reason for its adverse employment action. See id. Once DIMA has proffered such a reason, the presumption of discrimination vanishes, and the burden of production shifts back to Layton to show that the articulated reason was a pretext for discrimination. See id.; Smith v. Stratus Computer, Inc., 40 F.3d 11, 16 (1st Cir. 1994), cert. denied, 514 U.S. 1108 (1995).

In proving pretext for age discrimination, "the *facts* that comprised plaintiff's *prima facie* case may be considered, but the inference of discrimination originally attributable to those facts no longer pertains." Hidalgo, 120 F.3d at 335 (internal citation omitted). At all times, Layton bears the ultimate burden of persuading the Court that he has been the victim of intentional age

BOST_187580.3

discrimination.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993); Texas Dep't of

Community Affairs v. Burdine, 450 U.S. 248, 256 (1981).

      A.      Layton Cannot Establish a *Prima Facie* Case of Age Discrimination.

Layton cannot sustain even a *prima facie* case of age discrimination because he cannot

prove the second or fourth elements.  The undisputed facts demonstrate that Layton cannot show

that he was performing his job at an acceptable level, or that DIMA failed to treat age neutrally

or that younger persons were retained in the same position.

      *1.  Layton cannot show that he was performing his job at an acceptable level.*

According to the testimony of Layton's supervisor, G. West Saltonstall, at the time of his

termination Layton had "lost more business than any other advisor."  Saltonstall also testified

that he had received several recent complaints from clients about Layton, and that one client in

particular had threatened to sue DIMA with respect to Layton's performance.  (Saltonstall 230-

40.)  This testimony was corroborated by Kurt Miscinski, the business manager for the

Investment Advisory Division.  (Miscinski 169-72).  In addition to his lost business and client

complaints, Layton was known to be exceedingly unhappy and negative about working for

DIMA, and made clear to colleagues his opinion that the Scudder business could not succeed

within Deutsche Bank.   (SUF ¶ 10).

As this evidence makes clear, Layton cannot be deemed to have been performing his job

at an acceptable level at the time of his termination.

      *2.  Layton cannot show that DIMA failed to treat age neutrally or that younger persons were retained in the same position.*

Layton was 48 years old at the time of his termination.  (Complaint ¶ 6.)  Of the eight

other employees whose positions were eliminated in connection with the reduction in force, five

were younger than Layton, and three of these five were younger than 40.  Moreover, the two

BOST_187580.3

Managing Directors who were retained in the Boston office – Saltonstall and Deborah Moses – were *older* than Layton. Saltonstall was 58 years old and Moses was 51 years old at the time of Layton's termination. The other Investment Advisors retained within the Boston office had the following ages: Edward Bliss (age 70), Sam Perry (age 59), Susan Martland (age 53), Jonathan Treat (age 51); and Leonard Dolan (age 35). (SUF ¶¶ 41-42).

Layton will undoubtedly point to the fact that Dolan's name had appeared in early drafts of the termination list, and was removed from the list when Layton's name was added. Unlike Layton, however, Dolan, was not a Managing Director. Moreover, it should be noted that Bliss's name had also appeared on earlier drafts of the termination list and was eventually removed. (SUF ¶¶ 28, 30.) Thus, the reduction in force cannot reasonably be seen as an attempt to target older employees or one in which non-neutral criteria were used in deciding which positions would be eliminated.

The fact that DIMA may have retained younger Managing Directors in other locations is not probative because their positions cannot be considered to be the same position that Layton held in the Boston office. See, e.g., LeBlanc, 6 F.3d at 844 (court unconvinced that Agency Operations Representative ("AOR") positions held by thirty other younger individuals throughout an entire Northeast region could properly be considered the "same" AOR position that plaintiff held in eastern Massachusetts). The Investment Management Committee ("IMC") of the Investment Advisory Division had made a specific determination that Boston could absorb a reduction in head count because its had an excess of investment-advisor capacity relative to the generation of new business. (SUF ¶ 24.). Thus, Layton cannot demonstrate that DIMA retained younger persons in the same position that he held. There is simply no evidence to support an inference that DIMA improperly selected Layton for termination on the basis of his age.

BOST_187580.3

Because Layton cannot meet two of the four criteria necessary to establish a *prima facie* case, his claim for age discrimination must be dismissed.

      B.    <u>DIMA Had a Legitimate, Non-Discriminatory Reason for Terminating Layton</u>

Assuming for the sake of argument that Layton could establish a *prima facie* case of age discrimination, DIMA had legitimate, nondiscriminatory reasons for terminating him.  DIMA determined that cost reductions were necessary in the Investment Advisory Division and that eliminating positions within that Division would be one way to decrease expenses.  (SUF ¶¶ 21-23.)  That determination was clearly within the prerogative of management regardless of whether Layton or anyone else deemed it to be wise or justified.  <u>See Mesnick v. General Elec. Co.</u>, 950 F.2d 816, 825 (1st Cir. 1991), <u>cert. denied</u>, 504 U.S. 985 (1992) ("Courts may not sit as super personnel departments, assessing the merits – or even the rationality – of employers' nondiscriminatory business decisions").

Eventually, Saltonstall recommended Layton as a candidate for termination for multiple reasons other than age:

- Layton's termination would result in significant cost savings, as he was far more highly paid than the lower-level Investment Consultants on the earlier draft lists.

- Layton had been extremely vocal about his negative outlook towards DIMA and the efforts to integrate the Scudder and DIMA organizations.

- Layton had attempted to leave DIMA for LMCG earlier in the year and Saltonstall believed that would leave DIMA at the next available opportunity.

- Saltonstall did not believe that Layton would be able to take significant business away from DIMA.

- Layton had experienced a high volume of net outflows of assets from his accounts, as well as a number of client terminations, which both contributed to loss in revenues.

- Saltonstall had received recent complaints from several of Layton's clients, and DIMA was being threatened with a lawsuit by another of Layton's clients.

13

(SUF ¶ 29.)  In short, DIMA decided that Layton's termination would result in substantial cost savings, yet have a relatively minor impact on DIMA's business operations – a legitimate, nondiscriminatory basis for selecting him for termination.

      C.      Layton Cannot Produce Sufficient Evidence of Pretext

It is axiomatic that "the ADEA does not stop a company from discharging an employee for any reason (fair or unfair) or for no reason, so long as the decision to fire does not stem from the person's age." Mesnick, 950 F.2d at 825.  Layton bears the ultimate burden of proving not only that DIMA's articulated decision was a pretext or sham, but also that the real reason was his age.  See Shorette v. Rite Aid of Massachusetts, Inc., 155 F.3d 8, 13 (1st Cir. 1998).  Here, Layton may believe that DIMA's reasoning for terminating him was faulty or misguided, but there is no evidence that it was a pretext for age discrimination.

DIMA expects that Layton will claim that he has anecdotal knowledge of older employees who had been terminated in previous layoffs in other departments or corporate entities, and that this should be regarded as evidence of pretext.[3]  Such personnel actions occurring at other times and in other businesses are entirely distinct, and cannot be compared or considered in connection with Layton's termination.  The evidence in the record is overwhelmingly clear that Layton's termination in November 2002 resulted from a very specific process within the Investment Advisory Division, unrelated to any prior terminations or to terminations in other businesses.

DIMA further expects that Layton will claim that Leonard Dolan's undated note, "9 Reasons to Keep Me," should be regarded as evidence of pretext because Dolan pointed out that

---

[3] This allegation also serves as the basis of his claim that DIMA misstated the number and ages of employees who had been terminated from employment.

BOST_187580.3

he was the youngest Investment Advisor in the Boston office.  (SUF ¶ 31.) Common sense tells

us, however, that Saltonstall, who supervised both Dolan and Layton, would have been aware of

their relative ages without the note.

    Moreover, Dolan was a junior-level Investment Advisor with no supervisory authority

over Layton or any other Investment Advisors at DIMA.  Dolan was not a member of the IMC

and did not participate in the process by which Investment Advisors were selected for

termination.  (SUF ¶ 31.)  Consequently, this isolated remark from a person who did not

participate in the decision to select Layton for termination demonstrates nothing.  See, e.g.,

Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002) ("'[S]tray workplace remarks,' as well

as statements made either by nondecisionmakers or by decisionmakers not involved in the

decisional process, normally are insufficient, standing alone, to establish either pretext or the

requisite discriminatory animus."); Shorette, 155 F.3d at 8 ("textbook example of isolated

remark that demonstrates nothing").

    Layton has claimed that DIMA redistributed the accounts that he serviced to other,

younger Investment Consultants.  (Complaint ¶ 32).  The evidence, however, not only belies

Layton's allegation but in fact demonstrates that age was treated neutrally in the reduction in

force and subsequent reallocation of accounts.  Most of Layton's accounts were assigned to

Investment Advisors who were older than Layton, particularly Jonathan Treat (age 51) and Susan

Martland (age 53).   (SUF ¶¶ 43-45.)

    There are no other allegations to suggest that Layton's age was *ever* a concern for DIMA,

or that DIMA harbored age-related animus.  Saltonstall, who recommended Layton as a

candidate for termination, is ***ten years older*** than Layton.  (SUF ¶ 8.) Several of the Investment

Advisors who were retained in the Boston office, including Managing Director Deborah Moses,

BOST_187580.3

were also older than Layton.  (SUF ¶ 42.)  Layton's personal belief and unsupported speculation

that he would not have been terminated but for his age is, in and of itself, insufficient to establish

a claim of discrimination.  In short, his claim of age discrimination cannot be sustained and

summary judgment is appropriate.

II.    LAYTON HAS NOT STATED A CLAIM FOR BREACH OF THE IMPLIED
       COVENANT OF GOOD FAITH AND FAIR DEALING.

       It is well-established that an employer in Massachusetts can terminate an at-will

employee such as Layton at any time, with or without cause.  There are two very limited

exceptions in which termination of an at-will employee will be deemed a violation of the implied

covenant of good faith and fair dealing:  (1) where the employer's termination violates a clearly-

established public policy; and (2) where the termination has the effect of unfairly depriving the

employee of compensation previously earned but not yet paid (i.e., a sales commission).  See

Wright v. Shriners Hosp. for Crippled Children, 412 Mass. 469, 472 (1992); Fortune v. National

Cash Register Co., 373 Mass. 96, 105 (1977).

       The public policy exception is not available to a plaintiff who could have asserted a

statutory claim to vindicate his rights.  See Melley v. Gillette Corp., 19 Mass. App. Ct. 511, 513

(1985), aff'd 397 Mass. 1004 (1986) (age bias claim preempted by Mass. Gen. Laws ch. 151B).

In this case, to the extent that Layton is premising Count II on this public policy exception, such

a claim should be dismissed because he already has a statutory claim available to him for his age

discrimination allegations, the ADEA.  There is no need to create a common law claim for his

age discrimination claim as well.

       As for the second exception, Layton has not identified any earned compensation that was

allegedly denied to him, nor can he.  The $244,014 Special Performance Incentive award offered

in the letter-agreement cannot be construed as earned compensation.  Layton admitted that he

16

was not entitled to the payment unless he signed the release and non-solicitation agreement.

Layton rejected the offer.  (SUF ¶ 36.)  In short, Count II cannot survive summary judgment.

III.    LAYTON CANNOT ESTABLISH A CLAIM FOR BREACH OF CONTRACT
        BECAUSE HE NEVER ACCEPTED THE CONTRACT

        To recover damages for a breach of contract, Layton is required to demonstrate that (1)

the parties reached a valid and binding agreement; (2) DIMA breached the terms of the

agreements; and, (3) he suffered damages from the breach.  See Coll v. Diagnostic Sys., Inc., 50

F.3d 1115 (1ˢᵗ Cir. 1995).  According to his the Complaint, Layton's breach of contract claim is

based upon the November 19, 2002 letter-agreement.  The claim must fail because Layton did

not accept the letter-agreement as offered – no valid and binding agreement was ever formed.

        The letter-agreement providing for a $244,014 Special Performance Incentive Award

constituted an offer by DIMA to Layton.  Layton did not accept the terms of the letter-

agreement.  Instead, he crossed out material provisions on Paragraphs 4 and 5, and signed it with

the words "as amended" handwritten next to his signature.  (SUF ¶ 39.)  "A substantial variation

in contract terms incident to a purported acceptance is not a binding acceptance but a

counteroffer."  Massachusetts Housing Finance Agency v. Whitney House Associates, 37 Mass.

App. Ct. 238, 241 (1994).  See also Restatement (Second) of Contracts § 59 (1981) ("A reply to

an offer which purports to accept it but is conditional on the offeror's assent to terms additional

to or different from those offered is not an acceptance but is a counter-offer.")    In short, because

no contract was ever formed between the parties, DIMA was never obligated to pay Layton

$244,014 and cannot be held liable for an alleged breach of contract.

        Layton's breach of contract claim also fails due to a lack of consideration.  Layton did

not give up anything in exchange for signing and amending the Letter Agreement.  Specifically,

he did not abide by the provisions forbidding him from soliciting DIMA clients that he was

17

involved with, and he did not comply with the release of claims in that he proceeded to file an ADEA claim against DIMA. Layton cannot credibly argue otherwise. For this reason, too, Count III should be dismissed.

IV.    **LAYTON CANNOT ESTABLISH A CLAIM FOR FRAUDULENT OR NEGLIGENT MISREPRESENTATION BECAUSE HE DID NOT RELY ON THE ALLEGED MISREPRESENTATION**

To prove a claim of fraudulent or negligent misrepresentation, Layton must prove, among other things, that he relied to his detriment on the supposed misrepresentation. Damon v. Sun Co., Inc., 87 F.3d 1467, 1471-72 (1st Cir. 1996); Cole v. New England Mutual Life Ins. Co., 49 Mass. App. Ct. 296, 300 (2000). Because Layton never relied to his detriment on any supposed misrepresentation, his misrepresentation claims must fail.

Layton allegation that the OWBPA List was incomplete or inaccurate serves as the basis of his fraudulent and negligent misrepresentation claims. While DIMA categorically denies that the OWBPA List was deficient in any way, the sufficiency of the list is irrelevant – Layton never accepted the letter-agreement releasing his age discrimination claims. In fact, he is suing DIMA for age discrimination in this very lawsuit. Therefore, he cannot claim to have relied on the OWBPA List. His misrepresentation claim is entirely disingenuous, and Count IV merits dismissal.


**CONCLUSION**

For the reasons above, DIMA's Motion for Summary Judgment should be granted and this Court should enter judgment in favor of DIMA on Layton's Complaint.

BOST_187580.3

DEUTSCHE INVESTMENT MANAGEMENT
AMERICAS INC.,

By its attorneys,


/s/ David S. Rubin
David S. Rubin, BBO # 546213
Heather C. Krauss, BBO # 644457
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
Dated: January 17, 2006          (617) 342-4000



**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF),

and paper copies will be sent to those indicated as non registered participants on January 17,

2006, by overnight mail.


/s/ David S. Rubin

BOST_187580.3