UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

——————————————————————————

|  |  |  |
|---|---|---|
| JOHN R. LAYTON, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DEUTSCHE INVESTMENT MANAGEMENT | ) | CIVIL ACTION |
| AMERICAS, INC. | ) | NO. 04-10500-EFH |
| | ) | |
| *Defendant*. | ) | |

——————————————————————————

## DEFENDANT'S STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Rule 56.1, defendant Deutsche Investment Management Americas Inc. ("DIMA"), submits the following statement of undisputed material facts in support of its Motion for Summary Judgment. These undisputed material facts establish that DIMA is entitled to summary judgment as to all claims raised by the plaintiff, John Layton.

## UNDISPUTED MATERIAL FACTS

**A.      Background**

1.      Layton was born on September 1, 1954.  (Complaint ¶ 6.)

2.      Layton began working as an Investment Advisor in the Boston office of Scudder, Stevens & Clark on September 26, 1994, and remained with the firm after it was acquired by Zurich Insurance in 1997 and renamed Zurich Scudder Investments, Inc. ("Scudder").  (Layton 10-11; Saltonstall 22.)[1]

———————————

[1] Cited excerpts of testimony from the depositions of John Layton and G. West Saltonstall are attached to the Affidavit of David S. Rubin, Esq. at Ex. A and Ex. B, respectively.

3.      On April 8, 2002, Deutsche Bank acquired Scudder and, as a result, Layton became an employee of DIMA.  (Answer ¶¶ 8, 15; Layton 11.)

4.      At the time of the transaction, Layton held the corporate title of Managing Director, though his functional responsibility remained that of an Investment Advisor.  (Layton 10-11.)

5.      DIMA is a wholly-owned subsidiary of Deutsche Bank Americas Holding Corporation, which is ultimately a subsidiary of Deutsche Bank, A.G.  (Answer ¶ 6.)

6.      Among its array of financial services, DIMA offers investment management services to high net worth individuals through its Private Wealth Management ("PWM") organization.  PWM is divided into several distinct internal groups, including the Investment Advisory Division in which Layton worked as an Investment Advisor.  (Miscinski 35-37.)[2]

7.      G. West Saltonstall, who had also been a Managing Director in Scudder's Boston office, became one of the Regional Managers within the Investment Advisory Division following the acquisition by DIMA.  In that role, he was responsible for supervising Layton and the other Investment Advisors in the Boston office.  (Saltonstall 23-25; Miscinski 21, 39.)

8.      Saltonstall, whose date of birth is January 22, 1944, is ten years older than Layton.  (Ex. D.)

9.      Saltonstall was also designated to chair the Investment Management Committee ("IMC"), which was comprised of other Regional Managers within the Investment Advisory Division, as well as the Division's Business Manager, Kurt Miscinski.  Gloria Nelund, then head

---

[2] Cited excerpts of testimony from the testimony of Kurt Miscinski are attached to the Affidavit of David S. Rubin, Esq. at Ex. C.

of sales and marketing for PWM, also attended IMC meetings.  (See Saltonstall Dep. at 25-28; Miscinski 78-79.)

**B.      Layton's Negative Attitude Towards the Acquisition of Scudder by DIMA**

10.      At the time of the Scudder acquisition by DIMA and continuing throughout his tenure at DIMA, Layton openly expressed to Saltonstall and other colleagues his unhappiness about being part of DIMA, and his opinion that the Scudder business could not succeed within Deutsche Bank.  (Saltonstall 99-101, 238-40; Miscinski at 115-16, 130.)

11.      At the time of the Scudder acquisition, DIMA offered a special performance incentive award to a select group of employees within the Investment Advisory Division, including Layton.  The award, as described in a letter to Layton dated April 1, 2002, would consist of cash and equity to be made on or before October 14, 2003.  According to the letter, Layton would have to be actively employed by DIMA on the date of payment in order to be eligible for the award.  The letter further required Layton to agree that he would "return any and all information relating to clients and employees of Deutsche Bank" should he terminate his employment for any reason. (Grohowski 32, 39-40; Ex. F.)[3]

12.      Layton never signed and returned the April 1, 2002 letter to DIMA.  (Layton 67-68.)

13.      DIMA's senior management was aware that Layton did not sign the letter, contributing to the perception that Layton did not wish to remain at DIMA.  (Grohowski 41-43; Miscinski 170.)

---

[3] Cited excerpts of testimony from the testimony of Leo Grohowski are attached to the Affidavit of David S. Rubin, Esq. at Ex. E.

BOST_169887.3

14.    In May 2002, DIMA employees were asked to read and acknowledge their obligations under a Code of Ethics.  On May 13, 2002, Layton sent an e-mail to DIMA officials stating that he refused to be bound by a provision of the Code of Ethics that would prohibit him from soliciting DIMA's clients and employees while employed by DIMA and for a period of 12 months following termination of employment.  (Layton 34, 37-38; Ex. G; Ex. H.)

15.    Saltonstall and other DIMA managers were aware that Layton had been actively seeking other employment following DIMA's acquisition of Scudder. (Layton 23-24; Saltonstall 99-100; Grohowski Dep. at 23-24, 26-27.)

16.    Beginning in the spring or early summer of 2002, Layton interviewed with Lee Munder Capital Group ("LMCG") regarding the possibility of leaving DIMA to work there. These communications culminated with LMCG extending an employment offer to Layton and two other DIMA employees from the Boston office, Deborah Moses and Roy Duke.  Because the offer was conditioned on acceptance by all three of these individuals, it was ultimately withdrawn once Moses decided to reject it and stay with DIMA.  (Layton 15-17, 20-21.)

17.    Layton also interviewed with Stein Roe Investment Counsel in mid-2002 regarding the possibility of employment there.  (Layton 50-54.)

18.    In addition, Plaintiff testified at his deposition that he believes he may have interviewed for a position at Brown Brothers Harriman during that period.  (Layton 62.)

19.    During the time that Layton was employed by DIMA, he experienced a high volume of net outflows of assets from his accounts, as well as a number of client terminations, which both contributed to loss in revenues.  (Saltonstall 99-100, 230-40; Miscinski 114-16, 169-72.)

BOST_169887.3

20.    During the time that Layton was employed by DIMA, Saltonstall received complaints from several of Layton's clients, and DIMA was threatened with a lawsuit by another of Layton's clients.  (Saltonstall 99-100, 230-40; Miscinski 114-16, 169-72.)

**C.    DIMA's Decision to Reduce Number of Employees in Investment Advisory Decision**

21.    In the late summer of 2002, it became apparent that PWM was not going to meet its financial plans for the year and that PWM, as then constructed, would have difficulty meeting its objectives in future years.  Consequently, DIMA determined that it needed to reduce expenses in PWM.  (Grohowski 62-63.)

22.    As part of its cost reduction effort, DIMA decided to eliminate positions in the Investment Advisory Division, thereby saving compensation and benefits costs.  (Grohowski 57-58, 62-64.)

23.    On September 11, 2002, Leo Grohowski, who was then the Chief Investment Officer for PWM, wrote an e-mail to members of the IMC, instructing them to develop a plan to reduce head count in the Investment Advisory Division by $2.5 million and to have a recommendation to him by the end of the month.  (Grohowski 72-75; Ex. I.)

**D.    Selection of Layton for Termination**

24.    In developing a plan to reduce head count, the IMC determined that the Boston office could withstand a reduction in its complement of Investment Advisors because it had excess investment-advisory capacity relative to its generation of new business.  (Miscinski 80-84; Saltonstall 113-14.)

5

25.    The IMC reviewed extensive statistical information about each Investment Advisor, and relied on input from the Regional Managers who were most familiar with the individuals from the various offices.  (Miscinski 80, 88-90, 121-22; Saltonstall 69-71, 84-85.)

26.    Over the course of a few weeks, the IMC generated and revised several lists of possible terminations.  (Miscinski 89-91.)

27.    The earliest versions of the possible termination list included only more junior, lower-paid Investment Advisors.  When it became clear that this approach would not yield sufficient savings, the IMC began to give greater consideration to the more highly paid Investment Advisors who held the position of Managing Director.  (Miscinski 93, 96-97, 100, 105-07; Saltonstall 126-28.)

28.    A draft termination list from October 21, 2002 included three Investment Advisors from Boston, all below the level of Managing Director:  Vice President Edward Bliss (age 71), Vice President Eileen Buckley (age 49), and Leonard Dolan (age 36).  (Miscinski 90-96; Ex. J.)

29.    Saltonstall recommended to the IMC that Layton be added to the termination list for a number of reasons, including but not limited to:

- Layton's termination would result in significant cost savings, as he was far more highly paid than the lower-level Investment Consultants on the earlier draft lists.

- Layton had been extremely vocal about his negative outlook towards DIMA and the efforts to integrate the Scudder and DIMA organizations.

- Layton had attempted to leave DIMA for LMCG earlier in the year and Saltonstall believed that would leave DIMA at the next available opportunity.

- Saltonstall did not believe that Layton would be able to take significant business away from DIMA.

6

- Layton had experienced a high volume of net outflows of assets from his accounts, as well as a number of client terminations, which both contributed to loss in revenues.

- Saltonstall had received recent complaints from several of Layton's clients, and DIMA was being threatened with a lawsuit by another of Layton's clients.

(Saltonstall 99-100, 230-40; Miscinski 114-18, 169-72.)

30.    Based upon Saltonstall's recommendations, sometime after October 21, 2002, Bliss and Dolan were removed from the list and Layton was added.  (Saltonstall 204-05, 217-18; Miscinski Dep. at 146-48, 168-71; Ex. K.)

31.    At some point during the time that the IMC was working on its plan to reduce head count, Saltonstall forwarded to Gloria Nelund a note that Saltonstall had received from Investment Advisor Leonard Dolan entitled "9 Reasons to Keep Me."  In an apparent attempt to be humorous, Dolan listed nine reasons why he should not be terminated, including "Youngest in Boston – by almost 10 years."  Dolan was not a member of the IMC and there is no evidence that his note was considered by the IMC in making its decisions.  (Nelund 60-67; Ex. M.)[4]

32.    On November 19, 2002, Saltonstall and David Denaro, who was then a Senior Human Resources Advisor working in DIMA's Boston office, met with Layton to inform him that his employment would be terminated effective November 29, 2002.  (Layton 78-80; Ex. N.)

**E.    Separation Package Offered by DIMA**

33.    At the termination meeting on November 19, 2002, Saltonstall and Denaro presented Layton with a memorandum and proposed letter-agreement describing a "Separation Package" offered by DIMA.  The letter-agreement included on Exhibit A listing the job titles and

---

[4] Cited excerpts of testimony from the testimony of Gloria Nelund are attached to the Affidavit of David S. Rubin, Esq. at Ex. L.

BOST_169887.3

ages of employees in the Investment Advisory Division who had and had not been selected for termination.  (<u>Layton</u> 78-80; <u>Ex. N</u>; <u>Ex. O</u>.)

34.    Under the Separation Package, Layton received a severance payment of $213,687.00, representing twenty-seven weeks of compensation.  There is no dispute that DIMA made this severance payment to Layton.  (<u>Layton</u> 92-93; <u>Ex. N</u>.)

35.    As part of the Separation Package, DIMA offered Layton an *additional* $244,014.00 as a Special Performance Incentive award similar to that described in April 1, 2002 letter (<u>Ex. F</u>) that Layton had never accepted.  Payment of this Special Performance Incentive Award was contingent on Layton signing the letter-agreement, which included a release of claims. The letter-agreement also contained provisions that would have prohibited Layton from soliciting employees and existing or prospective clients of DIMA for one year following his termination date. (<u>Layton</u> 93-94; <u>Ex. N</u>; <u>Ex. O</u>.)

36.    Layton understood that he was not entitled to receive the $244,014.00 Special Performance Incentive award unless he signed the letter-agreement.  (<u>Layton</u> 96.)

**F.    Layton's Response to the Separation Package**

37.    On November 23, 2002, just a few days after learning of his termination and while still an employee of DIMA, Layton sent letters to approximately 500 of his client contacts to inform them of his departure from DIMA.  (<u>Layton</u> 102-05; <u>Ex. P</u>.)

38.    Given that Layton had already solicited customers in violation of the proposed letter-agreement, Denaro informed Layton that DIMA's offer of the Special Performance Incentive award would be withdrawn.  (<u>Layton</u> 101.)

8

39.    Layton crossed out the non-solicitation provisions of the letter-agreement, signed it "as amended," and mailed it to DIMA on or about December 31, 2002.  DIMA did not accept this counteroffer.  (Layton 106; Ex. Q.)

40.    Layton sent another letter to his client contacts on January 3, 2003 to announce that he had accepted a new position with LMCG.  (Layton 112; Ex. R.)

**G.    Ages of Individuals Terminated and Retained During Reduction in Force**

41.    Of the nine individuals terminated from the Investment Advisory Division November 19, five were younger than Layton, and three of the five were under the age of forty. (Ex. O.)

42.    The two Managing Directors who were retained in the Boston office – Saltonstall (age 58) and Moses (51) – were older than Plaintiff.  Edward Bliss, whose name was deleted from the termination list at around the time that Layton's was added, was 70 years old.  The other Investment Advisors retained within the Boston office had the following ages: Samuel Perry (age 59); Susan Martland (53), Jonathan Treat (age 51), and Leonard Dolan (age 35). (Ex. D.)

**H.    Reallocation of Accounts**

43.    Following Layton's termination, Saltonstall reallocated the accounts Layton had serviced to other Investment Advisors in the Boston Office:  Jonathan Treat (age 51), Susan Martland (age 53), Leonard Dolan (age 35), and Samuel Perry (age 59).  (Saltonstall 218-19; Ex. D; Ex. S.)

44.    A small number of Layton's former accounts were assigned to Director Ronald Bates (age 40) in the Cincinnati office, Vice President Monika Panger (age 43) in the

BOST_169887.3

Philadelphia office, Vice President John Heldman (age 44) in the Costa Mesa office, and Director Douglas Nardi (age 38) in the Chicago office.  (Ex. D; Ex. S.)

45.     A few of Layton's smallest accounts were transferred to the Structured Portfolio Management Group ("SPMG"), a new group established within the Investment Advisory Division in late 2002 to centrally manage relatively small-value client accounts.  (Saltonstall 156; Ex. S.)

## I.     Procedural Background

46.     On September 15, 2003, Layton filed a charge with the Equal Employment Opportunity Commission ("EEOC") in which he alleged that DIMA had discriminated against him on the basis of his age.  (Layton 127; Ex. T.)

47.     The EEOC issued a Notice of Dismissal of Layton's charge on December 18, 2003 on the grounds that "the evidence fails to indicate that a violation of the law occurred and it is not likely that additional investigation will result in our finding of a violation."  (Layton 140; Ex. U.)

Respectfully submitted,

DEUTSCHE INVESTMENT MANAGEMENT
AMERICAS INC.,

By its attorneys,


/s/ David S. Rubin
David S. Rubin, BBO # 546213
Heather C. Krauss, BBO # 644457
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
Dated: January 17, 2006                (617) 342-4000

10

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non registered participants on January 17, 2006, by overnight mail.

/s/ David S. Rubin

BOST_169887.3