UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| John R. Layton,<br><br>       Plaintiff,<br><br>v.<br><br>Deutsche Investment Management<br>Americas, Inc.,<br><br>       Defendant. | BBO No. 351000<br><br>Memorandum of Plaintiff, John R.<br>Layton, in Support of His<br>Opposition to Defendant's Motion for<br>Summary Judgment. |

Plaintiff, John R. Layton ("Layton"), submits this memorandum of law in opposition to the motion of defendant Deutsche Investment Management Americas, Inc. ("DIMA") for summary judgment.

    1.    <u>FACTS</u>.

Layton relies upon and incorporates herein by reference the facts set forth in his "Response ... to 'Defendant's Statement of Undisputed Facts'" and "...Counter Statement of Relevant Facts," filed herewith.

    2.    <u>ARGUMENT</u>.

    2.1    <u>This court should deny DIMA's motion for summary judgment because the evidence produced by Layton, as more particularly set forth in Layton's "Response ... to 'Defendant's Statement of Undisputed Facts'" and "...Counter Statement of Relevant Facts," filed herewith, raises genuine issues of material fact as to each of Layton's claims and DIMA is not entitled to judgment as a matter of law</u>.

The court should deny DIMA's motion for summary judgment unless "the record demonstrates that there is no genuine issue of material fact and that...[DIMA is] entitled to judgment as a matter of

law."[1]  In determining whether a genuine issue of material fact exists, the court must review the record in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor.[2]

With regard to Layton's age discrimination claim, the question to be decided is "whether [Layton]... has produced sufficient evidence from which a fact finder could reasonably conclude that [DIMA's] decision to terminate [him] was driven by discriminatory animus."[3]  Layton can defeat the motion for summary judgment by showing that a permissible inference of discrimination can be draw from the facts.  "The plaintiff does not have to prove by a preponderance of the additional evidence that discrimination was in fact the motive for the action taken.  All a plaintiff has to do is raise a genuine issue of fact as to whether discrimination motivated the adverse employment action."[4]  "[C]ourts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent."[5]

In the present case, the court should deny DIMA's motion for summary judgment because the evidence, as more particularly set forth in Layton's "Response ... to 'Defendant's Statement of Undisputed Facts'" and "...Counter Statement of Relevant Facts," filed herewith., raise genuine issues of material fact and DIMA is not entitled to judgment as a matter of law.

> 2.2    <u>The record contains sufficient evidence of discrimination to raise a genuine issue of material fact under the mixed motive/Price Waterhouse test or the McDonnell Douglas analysis</u>.

A plaintiff alleging age discrimination can prove his or her case using either direct or circumstantial evidence of discriminatory intent.[6, 7]

---

[1] Devlin v. WSI Corporation, 833 F.Supp. 69, 73 (D. Mass. 1993).  See also, LeBlanc v. Great American Insurance Company, 6 F.3d 836, 841 (1st Cir. 1993).
[2] LeBlanc, 6 F.3d at 841.  See also, Hayes, 8 F.3d at 90
[3] Zukowski v. St. Luke Home Care Program, 206 F.Supp.2d 236, 242 (D.P.R. 2002), citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143, 120 S.Ct. 2097 (2000).
[4] Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 433 (1st Cir. 2000); Santiago-Ramos v. Centennial P. R. Wireless Corp., 217 F.3d 46, 57 (1st Cir. 2000).
[5] Santiago, 217 F.3d at 54; Dominguez, 202 F.3d at 433.
[6] Moreno Morales v. ICI Paints (Puerto Rico), Inc., 383 F.Supp.2d 304, 308 (D.P.R. 2005), citing Rivera-Rodriguez v. Frito Lay Snacks Caribbean, 265 F.3d 15, 25 (1st Cir. 2001).
[7] The Court of Appeals for the First Circuit treats case law interpreting Title VII as instructive in cases under the

2.2.1   Direct evidence of discrimination.

To establish age discrimination by direct evidence, the plaintiff must satisfy the "mixed motive" test enunciated in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).  The plaintiff must produce direct evidence that discrimination was a "substantial factor" in the employer's decision.  Id. at 276.  As explained by the Court of Appeals for the First Circuit in Dominguez,

> When a plaintiff presents direct evidence of age discrimination, the defendant must then either "deny the validity or the sufficiency of the plaintiff's evidence," and "[have] the jury ⋯ decide[ ] whether the plaintiff has proved discrimination by a preponderance of the evidence," ..., or "prove that it would have made the same decision even if it had not taken the protected characteristic into account,"... or both, if it chooses.... <u>This burden makes it difficult, but not impossible, for defendants to obtain summary judgment</u>.

202 F.3d at 429.  (citations omitted, emphasis added).  The Price Waterhouse decision (O'Connor, J., concurring), states that "stray remarks in the workplace ... statements by non-decisionmakers, or statements by decisionmakers unrelated to the decisional process itself" (490 U.S. at 277) do not constitute "direct evidence," thereby indicating that statements offered as direct evidence must relate directly to the adverse employment action against the plaintiff employee.  Layton's evidence in the present case, clearly satisfies this test in that it consists of statements made or adopted by decisionmakers and relates directly to the decision to terminate Layton.

(a).   The Dolan memorandum.

After DIMA's Investment Management Committee ("IMC") had, on or about October 21, 2002, created a "termination list" of 13 proposed terminees, <u>not</u> including Layton, Saltonstall, who was both Layton's direct supervisor and a member of the IMC, received from Leonard Dolan, Layton's co-worker whose name was on the termination list, a memo entitled "9 Reasons to Keep Me."  The Dolan memorandum listed age related concerns as reasons 2 and 4:

2.   Youngest in Boston -- by almost 10 years
\*\*\*
4.   Continuity:  Can preserve the values and train future generations 10+ years after current staff is retired.

---

Age Discrimination in Employment Act ("ADEA").  Dominguez, 202 F.3d at 428 n.2.

3

In addition, the memo concluded with the observations "The argument that I can bounce back quicker than most because I an the youngest is no longer valid. I have friends in this business who have been unemployed for 10+ months. Some over a year." While the Dolan memorandum is undated, it can reasonably be inferred that it was prepared after Dolan became aware on or after October 21, 2002, that his name was on the termination list.

Saltonstall then forwarded the Dolan memorandum to his superior, Nelund. Although Layton's name was not on the termination list as of October 21, 2002, prior to Saltonstall's receipt of the Dolan memorandum, by the next IMC meeting on November 5, 2002, Layton's name had replaced Dolan's on the termination list dated November 1, 2002, and on the Restructuring Plan dated November 5, 2002. It is, therefore, reasonable to infer that the Dolan memorandum prompted DIMA to replace Dolan with Layton on the termination list.[8], [9]

The timing of the appearance of Layton's name on the termination list, combined with the fact that Saltonstall, a decisionmaker, forwarded the Dolan memorandum to Nelund, a higher ranking decisionmaker and the failure of either of them to disavow the ageist comments in the memorandum, provide strong and direct evidence that age was a substantial factor in DIMA's decision to terminate Layton.

While DIMA stresses that Dolan was not a decisionmaker with regard to Layton's termination, that is a "red herring." The critical fact is that Saltonstall, who was a decisionmaker, saw fit to forward the Dolan memorandum to a higher ranking decisionmaker, thereby adopting the ageist statements and neither decisionmaker, nor anyone at DIMA, disavowed the memo.[10]

---

[8] This is especially the case as there is no evidence that Dolan's performance improved or Layton's performance deteriorated between October 21 and November 1, 2002 so as to justify replacing Dolan with Layton on the termination list.

[9] The court should reject DIMA's argument that many employees were terminated and Layton was not replaced in his job by Dolan. Clearly, Layton was substituted for Dolan on the termination list.

[10] In any event, discriminatory remarks by a non-decisionmaker (Dolan) are relevant evidence of discriminatory animus on the part of the decisionmaker where the non-decisionmaker was in a position to influence the decision. See infra, §2.2.2(b)(i).

DIMA also argues that the Dolan memo is irrelevant because "Saltonstall, who supervised both Dolan and Layton, would have been aware of their relative ages without the note." Defendant's Memorandum ... in Support of Summary Judgment at p. 15. Again, that is not the point. While Saltonstall might have know the ages of Dolan and Layton, his act of forwarding the Dolan memorandum to a higher ranking decisionmaker at least raises an issue of fact as to whether Saltonstall, a decisionmaker himself, adopted the discriminatory statements in the Dolan memorandum as his own. It further raises a genuine issue of material fact as to whether the ageist content of the memo influenced the decision of Nelund and the IMC as to Layton's termination.[11]

As the Dolan memo contains ageist discriminatory statements related directly to the decision to terminate Layton, was adopted by one decisionmaker and likely influenced another, provides direct evidence of discrimination sufficient to shift to DIMA the burden to prove that it would still have fired Layton even had age not been considered. Such proof raises issues of motivation and intent that are not suited to summary judgment.

(b).    The termination list.

The other piece of direct evidence relied upon by Layton is the termination list itself. As forwarded to DIMA's top management by DIMA's Human Relations Department, the October 21, 2002, version of the termination list included the "age as of 12/31/02" of each of the proposed terminees. Later lists dated November 1 and November 5, 2002, omit the age information.

The inclusion of age information on the termination list indicates that decisionmakers at DIMA considered age an important factor in their termination decisions. Given that there is no dispute that the termination list was relied upon by the IMC in making its decisions to terminate Layton and others, and that there was no legitimate reason why a list of people to be fired would include their ages, the DIMA

---

[11] Nor should this court accept DIMA's claim that the Dolan memorandum was just a bit of office humor. In addition to the obviously serious context in which the memo was written (an impending layoff), the text of the memo itself is far from humorous. Dolan's notation at the end of the memo that he could not easily recover from a layoff, and that friends of his been out of work for a year, is deadly serious.

5

termination list provides strong evidence, directly related to Layton's termination, that age was a substantial factor in DIMA's termination decision.

    2.2.2   <u>Circumstantial evidence of discrimination</u>.

In the absence of direct evidence, a plaintiff can prove age discrimination through circumstantial evidence.

> Under the <u>McDonnell Douglas</u> procedural framework, the plaintiff must prove that: (1) he was over forty (40) years of age; (2) his job performance was sufficient to meet his employer's legitimate job expectations; (3) he experienced an adverse employment action; and (4) the employer continued to need the services of the position claimant occupied. ...

<u>Morales</u>, 383 F.Supp.2d at 308.[12]  The plaintiff's obligation to make a prima facie case is "not onerous."[13]

> Once plaintiff has complied with this initial prima facie burden the defendant must "articulate a legitimate nondiscriminatory reason" for the challenged conduct at which time presumption of discrimination fades and the burden then falls back on plaintiff who must then demonstrate that the proffered reason was a "pretext" and that the decision at issue was instead motivated by discriminatory animus.

<u>Morales</u>, 383 F.Supp.2d at 308.[14]

Pretext can be established by showing "<u>either</u> that her dismissal was (i) 'more likely motivated' by discrimination than by the explanation proffered by [the employer] <u>or</u> (ii) the proffered 'explanation [was] unworthy or credence' in circumstances where the suspect denial, taken together with other facts, suggests such a motivation." <u>Straughn</u> v. <u>Delta Air Lines, Inc.</u>, 250 F.3d 23, 35 (1st Cir. 2001) (Emphasis in original).  The plaintiff can show that the employer's proffered reasons are pretextual by various means, including evidence of "discriminatory comments made by a decisionmaker or those in a position to influence the decisionmaker," by "showing 'weaknesses ... or contradictions in the employers proffered legitimate reasons' ..." (<u>Santiago</u>, 217 F.3d at 55-56) or by showing that the employer has altered its proffered reasons for the employment action.  <u>Dominguez</u>, 202 F.3d at 432.  Once pretext is established,

---

[12] See also  <u>Ramirez Rodriguez</u> v. <u>Boehringer Ingelheim Pharmaceuticals, Inc.</u>, 425 F.3d 67, 77-78 (1st Cir. 2005); <u>Gonzalez</u> v. <u>El Dia, Inc.</u>, 304 F.3d 63, 68-69 (1st Cir. 2002).
[13] <u>Fernandes</u> v. <u>Costa Brothers Masonry, Inc.</u>, 199 F.3d 572, 580 (1st Cir. 1999).
[14] See also  <u>Ramirez Rodriguez</u> v. <u>Boehringer Ingelheim Pharmaceuticals, Inc.</u>, 425 F.3d 67, 77-78 (1st Cir. 2005); <u>Gonzalez</u> v. <u>El Dia, Inc.</u>, 304 F.3d 63, 68-69 (1st Cir. 2002).

the "same evidence used to show pretext can support a finding of discriminatory animus if it enables a factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action." Straughn, 250 F.3d at 34.

   (a).   The prima facie case.

Layton easily makes out a prima facie case. DIMA does not dispute that Layton was over 40 and thus belonged to the protected class, nor does DIMA dispute that it took an adverse employment action against Layton. While DIMA claims Layton was not performing his job satisfactorily, that is not correct. Layton was well qualified and rose quickly through the ranks at Scudder Stevens & Clark ("Scudder") and later at DIMA.[15] At the time of his termination on November 19, 2002, Layton remained, along with one Moses, the top-performing Portfolio Managers in the DIMA Boston office. At the very least, these facts raise a genuine issue of material facts as to whether Layton was performing his duties adequately.

The evidence also shows that DIMA continued to need the services performed by Layton and that Layton's duties were taken over by other comparably qualified persons at DIMA. Although DIMA contends that a number of individuals assumed responsibilities for those of Layton's accounts that remained at DIMA after Layton's termination (a majority of accounts after Layton's termination left DIMA to go elsewhere), and that these individuals were both older and younger than Layton, as a Portfolio Manager, Layton replaced Dolan, a much employee, on the termination list. As to his ESG duties, Layton was replaced by Fitzpatrick who, at age ___, also was substantially younger than Layton, and who had had significant performance issues, which had brought him to the attention of the IMC as a candidate for termination.

   (b).   Pretext and DIMA's discriminatory motivation.

---

[15] In 1994, Layton was hired by Scudder as an Investment Advisor. He was promoted to Managing Director of Scudder shortly after its acquisition by Zurich Insurance in 1997. On April 8, 2002, Deutsche Bank ("Deutsche Bank") acquired Scudder from Zurich Insurance and in April, 2002, Leo Grohowski ("Grohowski"), a Deutsche Bank principal with responsibility for the Private Wealth Management Group ("PWM GROUP"), made Layton a member of Deutsche Bank's Equity Strategy Group ("ESG"), which was being established to develop a rational stock selection process for the entire PWM GROUP. Thereafter, in August 2002, Grohowski promoted Layton to Co-chair of the ESG, sharing duties with the other Co-chair, W. Owen Fitzpatrick ("Fitzpatrick").

Assuming, without admitting, that DIMA has stated facially valid reasons for terminating Layton, the evidence establishes that the stated reasons were mere pretexts and that DIMA was actually motivated by discriminatory animus.

(i)     Discriminatory statements.

The court has before it evidence of discriminatory statements in the form of the Dolan memorandum and the termination list. Even if these statements do not constitute direct evidence of discrimination, they provide circumstantial proof of pretext and discriminatory animus.

The Dolan memorandum directly concerned the employment decision at issue and overtly suggested that discriminatory age considerations be taken into account in determining who should be fired. It was written by one of Layton's co-workers, was sent to a decisionmaker, Saltonstall, who then forwarded the memo to Nelund, a higher ranking decisionmaker. Given that the Dolan memorandum, replete with discriminatory remarks, was adopted by one decisionmaker and received by another, and that neither saw fit to disavow reliance on the memo, there is at least a genuine issue of material fact as to whether Dolan's discriminatory remarks influenced the decision to terminate Layton.[16] As discussed above, the termination list also provides clear evidence that DIMA's decision was motivated by discriminatory animus and its non-discriminatory reasons were pretexts.

DIMA argues that the Dolan memorandum is irrelevant because Dolan himself was not a decisionmaker. However, even setting aside the adoption of the Dolan memorandum by Saltonstall, courts in the First Circuit and elsewhere have made clear that, where a non-decisionmaker was in a position to influence the decisionmaker, discriminatory statements by that non-decisionmaker should be considered as circumstantial evidence that the employers proffered reasons are pretexts and that the employment decision was motivated by discriminatory animus. Rodriguez, 425 F.3d at 79

---

[16] See Price Waterhouse, 490 U.S. at 256 (stressing that accounting firm had not disavowed reliance on discriminatory remarks contained in employee evaluation forms when making partnership decision).

8

("discriminatory comments may be probative of pretext if a plaintiff can show that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker.").[17]

In fact, the question whether and to what extent a non-decisionmaker's discriminatory statements influenced the final decision is itself a question of fact for the jury and precludes summary judgment.[18] Even in the absence of evidence that a non-decisionmaker influenced an employment decision, evidence of discriminatory statements by the non-decisionmaker are relevant in that they establish a discriminatory atmosphere in the workplace which itself may have influenced the decision.  Santiago, 217 F.3d at 55

Therefore, the discriminatory statements in the Dolan memorandum, and the overt references to age in the termination list, are highly relevant to the question whether DIMA's decision to terminate Layton was motivated by discrimination.  At the very least, the conduct of Saltonstall in forwarding the memo to Nelund, raises a genuine issue of material fact as to whether, and to what extent, the Dolan memorandum influenced the ultimate decision to terminate Layton.

   (ii)   Shifting rationales suggest pretext.

The Dominguez court stated:

---

[17] Straughn, 250 F.3d at 35 ("The burden of persuasion on pretext may be met, inter alia, by showing that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker"); Santiago, 217 F.3d at 55 (same); Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 676 (1st Cir. 1996); Russell v. McKinney Hospital, 235 F.3d 219, 229 (5th Cir. 2000) ("Age-related remarks are appropriately taken into account when analyzing the evidence supporting the jury's verdict (even if not in the direct context of the decision and even if uttered by one other than the formal decisionmaker, provided that the individual is in a position to influence the decision)"); Reeves, 530 U.S. at 141 ("liability depends on whether the protected trait ... actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome"); Sadki v. Suny College at Brockport, 310 F.Supp.2d 506, 513 (W.D.N.Y. 2004)("There is considerable authority .. that the element of causation--i.e. that an adverse employment action was caused by discrimination--can be satisfied by showing that a person with discriminatory animus toward the plaintiff influenced the 'actual' decisionmaker, even if the latter did not consciously discriminate against the plaintiff.").

[18] Gee v. Principi, 289 F.3d 342, 346 (5th Cir. 2002) ("The ultimate question, therefore, is whether the employee can demonstrate that others had influence or leverage over the official decisionmaker.... [T]he degree to which [the final decisionmaker's] decisions were based on his own independent investigation is a question of fact."); Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 355 (6th Cir. 1998) ("Therefore, we conclude that a genuine issue of fact exists as to whether Gallagher was involved in the employment decisions adverse to Ercegovich, and we must assume for purposes of summary judgment that Gallagher did in fact play a meaningful role in those decisions. Gallagher's statements thus cannot be excluded under the McDonald rule, and the district court erred in concluding otherwise." (Emphasis added));  Sadki, 310 F.Supp.2d at 515; Long v. Eastfield College, 88 F.3d 300, 307 (5th Cir. 1996).

> A company may have several legitimate reasons to dismiss an employee. But when a company, at different times, gives different and arguably inconsistent explanations, a jury may infer that the articulated reasons are pretextual.

202 F.3d at 432. See also Cummings v. Standard Register Co., 265 F.3d 56, 64 (1st Cir. 2001). In the present case, DIMA offered multiple and changing explanations for terminating Layton. The "script" provided by DIMA's Human Relations Department to explain Layton's termination cited "excess capacity in Boston." However, on the day of his termination, Layton was given a different explanation by Saltonstall, that he was not considered a team player. Saltonstall also referred to a third reason, also not mentioned in DIMA's script, that DIMA was "restructuring" and "downsizing." DIMA also claimed to have considered various performance factors, including lost clients and revenues generated.

    (iii)  <u>DIMA's proffered non-discriminatory explanations are not credible</u>.

The explanation that there was "excess capacity in Boston," is not credible because Layton had dual functions at the DIMA Boston office as a Portfolio Manager and as Co-chairman of the ESG. Saltonstall's claim that Layton was not a "team player" was no more believable. Saltonstall had encouraged Layton to take on additional responsibility as a member, and then Co-chair, of the ESG. Layton had done so. In fact, Layton was promoted to Co-chair of the ESG only after he convinced Grohowski of his commitment to DIMA.[19]

DIMA's claim that it terminated Layton due to "restructuring" and "downsizing" was also false. Layton's Portfolio Manger and ESG responsibilities continued to be performed by other persons, specifically Dolan and Fitzpatrick. Moreover, while DIMA's IMC claimed to have considered a number of performance factors in the decisions on prospective terminees, e.g. client terminations, third quarter

---

[19] The fact that Layton elected not to sign the Additional Incentive Agreement and his investigation of other employment opportunities just prior to the merger, do not indicate that Layton lacked interest in working for DIMA. Layton elected not to sign the Additional Incentive Agreement only because he considered the performance incentive to be "overly mercenary" in that he did not believe it to be appropriate to tie his compensation at a specific future date to the performance of his clients' accounts, and that he did not need such an incentive to continue doing good work for his clients after the acquisition. While Layton interviewed with other employers prior to the merger, many other investment professionals of Scudder considered alternative employment opportunities, principally because of concern over their clients' reactions to acquisition of Scudder by a large German bank. In fact, Saltonstall himself had sought an employment opportunity with LMCG.

revenues, etc., Layton remained an above average performer in all categories, and Dolan continued to be a substantially below average performer in all categories. In fact, at the time of his termination on November 19, 2002, Layton remained, along with Moses, the top-performing Portfolio Managers in the DIMA Boston office.[20] Although DIMA purports to justify the substitution of Dolan for Layton on the termination list on the basis that IMC determined that DIMA needed to look at a higher level of Portfolio Manager (Directors and Managing Directors) because of failure to have met the dollar mandate, the November 12, 2002, e-mail actually identifies only two Managing Directors to be on the termination list: Layton and Bliss. However, as Bliss was never terminated, Layton was apparently the only DIMA Managing Director who was terminated.

> (iv) Efforts to conceal the firing of ADEA protected employees evidence DIMA's discriminatory motivation.

On the day of his termination, Layton was then presented with a proposed letter agreement, dated November 19, 2002 (the "letter agreement"). The letter agreement conditioned a severance payment of $244,000 upon the execution by Layton of a release of his age discrimination claims. Appendix A to the letter agreement referred to nine positions that were being eliminated, including two at the Managing Director level. Layton quickly determined that the list was wildly inaccurate, in that it substantially understated the number of employees terminated at DIMA since the Deutsche Bank acquisition of Scudder in April 2002, almost all of whom Layton knew to be substantially over 40 years of age. See Affidavit of David R. O'Hara, a DIMA employee who compiled a list of terminated employees and the dates of their termination, which shows that many more people were terminated at DIMA between June 1, 2002, and December 31, 2002, than were listed on Appendix A to the November 19, 2002 letter agreement presented to Layton.

---

[20] All DIMA Portfolio Managers had had significant lost fees as the result of client terminations in 2002 and, even assuming the accuracy of DIMA's figures, at least seven Portfolio Managers had larger losses as a percentage of annual revenue than Layton had had.

11

In addition, while the certain iterations of the termination list included the ages of the proposed terminees, the final Restructuring Plan of November 5, 2002, did not.

Both the incomplete Appendix A and the removal of age information from the final Restructuring Plan demonstrate attempts by DIMA to hide its pattern of age discrimination. DIMA's concealment efforts themselves constitute evidence of pretext and discriminatory animus.

> 2.3  If this court does not deny summary judgment outright, it should defer ruling on Layton's ADEA claims, as discovery is not complete and summary judgment would be premature.

Fed.R.Civ.P. 56(f) states,

> When affidavits are unavailable. Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

In Bird v. Continental Insurance Company, 1993 WL 485781, *6 (1st Cir. December 1, 1993), the Court of Appeals stated,

> Rule 56(f) offers an "`escape hatch'" to a party opposing a summary judgment motion who "genuinely requires additional time to marshall `facts essential to justify its opposition'".[21]

The general rule in the First Circuit is that a court should grant a Rule 56(f) motion where the party seeking discovery submits a Rule 56(f) affidavit showing: (1) a plausible basis for the belief that specified discoverable material facts exists which are not yet in evidence; (2) a realistic prospect that the additional facts can be obtained within a reasonable time; (3) that the additional facts will create a trial-worthy issue which is both genuine and material; and (4) good cause to explain why the party seeking discovery did not conduct discovery earlier.[22]

---

[21] Quoting Mattoon v. City of Pittsfield, 980 F.2d 1, 7 (1st Cir. 1992) which quoted Patterson-Leitch Co. v. Massachusetts Municipal Whole Sale Electric Co., 840 F.2d 985, 988 (1st Cir. 1988).

[22] Bird, 1993 WL 485781, *6; Mattoon, 980 F.2d at 7-8; Bank One Texas, N.A. v. A. J. Warehouse, Inc., 968 F.2d 94, 100 (1st Cir. 1992); Nestor, Colon, Medina & Sucessores, Inc. v. Custodio, 964 F.2d 32, 38 (1st Cir. 1992); Price v. General Motors Corporation, 931 F.2d 162, 164 (1st Cir. 1991); Patterson-Leitch, 840 F.2d at 988-990; Strahm v. WSI Corporation, 1993 WL 540566, *9 (D. Mass. May 14, 1993).

Finally, it is settled law in the First Circuit, and elsewhere, that a court should liberally apply Rule 56 where the interests of justice would be served[23], and Rule 56(f) motions should be granted routinely where the party moving for summary judgment has sole possession of the facts needed to oppose the motion.[24]

The present case presents exactly the type of situation in which Layton's motion under Rule 56(f) should be granted.  With regard to Layton's disparate impact ADEA claims, prior to 2005, it was at best unclear whether a claim for disparate impact could be brought under the ADEA.  In Smith v. City of Jackson, Miss., 544 U.S. 228, 125 S.Ct. 1536, 1540 (2005), the Supreme court held that the ADEA did allow disparate impact liability.  However, because this theory was not available when this case was filed, Layton should be permitted to conduct the additional discovery and depositions, and to retain expert(s) to review of the evidence and report, in order to determine whether the DIMA terminations had a disparate impact based on age.  Layton intends to depose Deutsche Bank executive James Maloney concerning the impact of the DIMA terminations.  Entering summary judgment without affording Layton a reasonable time to complete discovery pertaining to this claim, would be unjust.

The court also should defer ruling on, and allow additional discovery concerning, Layton's disparate treatment ADEA claims.  The Dolan memorandum, relied upon by Layton as direct (or failing that circumstantial) evidence of discrimination, was produced by DIMA only after Layton deposed Saltonstall (the initial recipient of the memo) and only at 5:30 p.m. on the night before the deposition of Nelund (to whom Saltonstall forwarded the Dolan memo).  DIMA's late production prevented Layton from adequately deposing these key decisionmakers about the influence which this critical piece of evidence had on the deliberations leading to Layton's termination.  The court should afford Layton a

---

[23] Patterson-Leitch, 840 F.2d at 989; Hebert v. Wicklund, 744 F.2d 218, 222 (1st Cir. 1984).
[24] Hebert, 744 F.2d 222 n.4, citing Ward v. United States, 471 F.2d 667, 670 (3rd. Cir. 1973); Concord Laboratories, Inc. v Concord Medical Center, 552 F.Supp. 549, 554 (N.D. Ill. 1982).  See also, International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1267 (5th Cir. 1991); Strahm, 1993 WL 540566, *6; C-B Kenworth, Inc. v. General Motors Corporation, 118 F.R.D. 14, 16-17 (D. Me. 1987) ("continuances under Rule 56(f) are particularly appropriate where the cause of action is complex, and where the facts essential to the opposing party's affidavit are within the other party's exclusive control.").

reasonable time within which to redepose Saltonstall and Nelund. Finally, there is testimony in the record that Mr. Pierre deWeck, a London based executive of Deutsche Bank, was the architect of the decision to terminate personnel at DIMA in the fall of 2002. However, as Mr. deWeck was not identified in DIMA's Initial Disclosures under Rule 26(a), his deposition has not yet been taken (his name surfaced for the first time only in depositions of other DIMA witnesses whose identities had been disclosed).

    2.4    <u>Layton's evidence establishes a valid claim for breach of the covenant of good faith and fair dealing</u>.

Every contract is subject to an implied covenant of good faith and fair dealing.[25] That covenant "requires that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."[26]

The covenant of good faith and fair dealing applies to at-will employment and is breached when an employer terminates an employee in order to avoid paying compensation or benefits already earned (or about to become vested). <u>Fortune</u> v. <u>National Cash Register Corsage.</u>, 373 Mass. 96, 102 (1977).[27] Later cases extended <u>Fortune</u>, holding that the employer breaches the implied covenant of good faith and fair dealing by terminating an at will employee "without good cause and for the purpose of appropriating the employee's commissions that were `reasonably ascertainable future compensation based on his past services.'"[28]

DIMA did exactly that in the present case. The letter agreement provided to Layton when he was terminated provided no payment for any portion of Layton's bonus for 2002, even though Layton had been

---

[25] <u>Judge Rotenberg Educational Center, Inc. v. Comm. of the Dept. of Mental Retardation</u>, 424 Mass. 430, 448 (1997); <u>Anthony's Pier Four</u> v. <u>HBC Associates</u>, 411 Mass. 451, 473 (1991); <u>Williams v. B & K Medical Systems, Inc.</u>, 49 Mass.App.Ct. 563, 569 (2000).

[26] <u>Blank</u> v. <u>Chelmsford OB/GYN, P.C.</u>, 420 Mass. 404, 407, 649 N.E.2d 1102 (1995); <u>Anthony's Pier Four</u> v. <u>HBC Associates</u>, 411 Mass. 451, 473 (1991); <u>Williams v. B & K Medical Systems, Inc.</u>, 49 Mass.App.Ct. 563, 569 (2000).

[27] <u>See also</u> <u>Sands</u> v. <u>Ridefilm Corp.</u>, 212 F.3d 657, 662-63 (1st Cir. 2000); <u>Michelson</u> v. <u>Digital Financial Services</u>, 167 F.3d 715, 726 (1st Cir. 1999); <u>Coll</u> v. <u>PB Diagnostic Systems, Inc.</u>, 50 F.3d 1115, 1125 (1st Cir. 1995); <u>King</u> v. <u>Driscoll</u>, 673 N.E.2d 859, 862 (Mass. 1996); <u>Blank</u> v. <u>Chelmsford OB/Gyn, P.C.</u>, 649 N.E.2d 1102, 1105 (Mass. 1995); <u>William's</u> v. <u>B & K Medical Systems, Inc.</u>, 732 N.E.2d 300, 305 (Mass.App.Ct. 2000).

[28] <u>Michelson</u>, 167 F.3d at 726, quoting <u>Gram</u> v. <u>Liberty Mutual Ins. Co.</u>, 429 N.E.2d 21, 29 (Mass. 1981).

employed for 11 of the 12 months of 2002, and had made substantial financial contributions during that year.

    2.5    <u>The evidence supports Layton's breach of contract claim</u>.

DIMA's failure to pay Layton the 2002 bonus to which he was entitled, as described in the preceding section, also constituted a breach of contract.

In addition, DIMA's termination of Layton breached an implied agreement between DIMA and Layton that Layton would not be terminated, at least not in the immediate post-merger round of terminations. On April 8, 2002, Deutsche Bank ("Deutsche Bank") acquired Scudder from Zurich Insurance and Layton became a Managing Director of DIMA. During the merger negotiations prior to April 2002, and continuing for a brief period thereafter, Layton and many other investment professionals of Scudder considered alternative employment opportunities, principally because of concern over their clients' reactions to acquisition of Scudder by a large German bank.

DIMA engaged in a concerted effort to convince Layton not to accept employment elsewhere, and convinced Layton to continue working for DIMA by promising him promotions and additional compensation. Deutsche Bank's Grohowski made promises to Layton to induce Layton to stay on with Deutsche Bank, including a promise that in addition to continuation of Layton's portfolio management duties, Layton would be given additional responsibilities as a member of Deutsche Bank's ESG. Layton understood from this discussion with Grohowski that his compensation at DIMA would be enhanced if he accepted this dual role in the merged entity. In particular, Grohowski told Layton that if Layton could convince him of his "commitment" to DIMA and the PWM Group, Grohowski would make him Co-chair of the ESG and would enhance Layton's compensation to reflect his new duties and responsibilities, and Layton responded to this offer that he was committed to DIMA for the long term. As a result of this discussion, Layton was promoted to Co-chair of ESG. In August 2002, approximately two months after an alternative employment opportunity at Lee Munder Capital G r o u p ( L M C G " )

15

offered as a package deal to Layton, Moses and W. Roy Duke had been withdrawn, Grohowski told Layton that Layton would be "crazy to accept other employment".

DIMA's promises and representations carried with them the implicit agreement that DIMA would not fire Layton in layoffs related to the merger. Both parties understood this to be the agreement, as it would have made no sense for Layton to forego good employment opportunities elsewhere only to be fired by DIMA shortly after the merger.

At the time of its acquisition of Scudder, Deutsche Bank knew not only that the financial markets were deteriorating rapidly but also that the Scudder workforce was substantially older than the Deutsche Bank workforce, particularly at senior portfolio management levels. Accordingly, Deutsche Bank knew that the acquisition of Scudder would result in substantial downsizing of the number of personnel employed, with significant adverse effect on Scudder's older employees. Despite this awareness, Deutsche Bank never communicated to Layton that he was considered other than a stellar performer or that his decision to decline to participate in the Special Performance Incentive program could have an adverse impact on his career.

Layton relied on DIMA's promises by continuing his work for DIMA, and in fact did not pursue good opportunities to become employed elsewhere. Yet DIMA terminated Layton just three (3) months after promoting him to Co-chair of the ESG. This was a clear breach of their contract.

    2.6    <u>Layton has submitted sufficient evidence to warrant a trial on his claims of fraudulent or negligent misrepresentation</u>.

    2.6.1    <u>Fraudulent misrepresentation</u>.

In order to show intentional, fraudulent misrepresentation, a "plaintiff must also show that defendant made the false representation wither knowing that the statement was false or with reckless disregard for the truth."[29]  A plaintiff must prove "that the defendant 1) made a false representation of

---

[29] <u>Vision Graphics, Inc.</u> v. <u>E. I. Du Pont de Nemours & Co.</u>, 41 F.Supp.2d 93, 100 (D. Mass. 1999).

material fact, 2) with knowledge of its falsity, 3) for the purpose of inducing the plaintiff to act thereon, and 4) that the plaintiff relied upon the statement to his or her detriment."[30]

Although the general rule is that a party's promises as to its future conduct are not actionable, such statements do give rise to an action for misrepresentation when it appears that the "statements misrepresent the actual intention of the speaker ...."[31] While false statements of opinion and false statements about the future generally are not actionable, Cellucci v. Sun Oil Co., 2 Mass.App.Ct. 722, 730 (1974). See also Masso v. United Parcel Service of America, Inc., 884 F.Supp. 610, 616 (D.Mass. 1995), [a] statement is in the form of an opinion, or concerning future conduct, is really a statement of fact, and is actionable, where "it may reasonably be understood by the recipient as implying that there are facts to justify the opinion or at least that there are no facts that are incompatible with it."[32] A party's statement about its own future conduct is actionable because it reasonably implies to the recipient of the statements that the speaker based the statements on facts known to it.[33] Additionally, statements concerning future conduct are actionable where they concern matters as to which the speaker has superior knowledge and which are entirely within speaker's own control.[34]

The facts set forth in §2.5, supra, with respect to breach of contract also support a fraud claim. DIMA, induced Layton to forego good employment opportunities elsewhere through promises and other representations which carried the implicit agreement not to fire Layton in the round of terminations

---

[30] Johnson v. Brown & Williamson Tobacco Corp., 122 F.Supp.2d 194, 207 (D.Mass. 2000). See also, Zuckerman v. McDonald's Corp., 35 F.Supp.2d 135, 14 (D. Mass. 1999).

[31] Starr v. Fordham, 420 Mass. 178, 187 (1995). See also Rodowicz v. Massachusetts Mutual Life Ins. Co., 192 F.3d 162, 176 n.10 (1st Cir. 1999)("statements of opinion may be actionable where the defendant misrepresents his actual present intent to perform a future act").

[32] McEneaney, 38 Mass.App.Ct. at 575. citing Briggs v. Carol Cars, Inc., 407 Mass. 391, 396 (1990) and Restatement (second) of Torts, §539. See also Cummings, 244 F.3d at 22; Arthur D. Little v. Dooyang Corp., 928 F.Supp. 1189, 1204-05 (D.Mass. 1996).

[33] See McEneaney, 38 Mass.App.Ct. at 575 (condominium purchaser reasonably inferred "that real estate agent knew facts to justify her opinion [as to quietness of unit] based upon the fact that [agent's] employer ... maintained an office at [the condominium complex] as on-site realtor and had been involved in the sale of units from the time of the complex's original conversion to condominiums").

[34] Cellucci, 2 Mass.App.Ct. at 730; Rodowicz, 192 F.3d at 176 n.10; Frederick v. Conagra, Inc., 713 F.Supp. 41, 46-47 (D. Mass. 1989). See also Masso, 884 F.Supp. at 616-17; Benham v. Lenox Savings Bank, 26 F.Supp.2d 231, 236 (D. Mass. 1998).

related to the merger. Yet DIMA knew at the time it made those promises that it did not intend to accord Layton any protection from being included in the post merger terminations. Layton reasonably relied on DIMA's false representations to his detriment. As set forth above, DIMA is liable in fraud for making false statements about its own future conduct.

2.6.2   Negligent misrepresentation.

Massachusetts recognizes the tort of negligent misrepresentation. Cole v. New England Mutual Life Ins. Co., 49 Mass.App.Ct. 296, 300 (2000). In order to prove a claim for negligent misrepresentation, a "plaintiff must show that the defendant, in the course of his business, supplied false information for the guidance of another upon which the plaintiff justifiably relied to his financial detriment and that the defendant failed to exercise reasonable care or competence in obtaining or communicating the information." Cole v. New England Mutual Life Ins. Co., 49 Mass.App.Ct. 296, 300 (2000). See also Golber v. BayBank Valley Trust Co., 46 Mass.App.Ct. 256, 257 (1999); Restatement (second) of Torts, §552. "For a negligent misrepresentation claim, courts ask simply whether the speaker was negligent in failing to discover the falsity of his or her statements." Cummings v. HPG International, Inc., 244 F.3d 16, 25 (1st Cir. 2001).

Based upon the same facts as support the breach of contract and fraud claims, DIMA is liable for negligent misrepresentation if it reasonably should have known that it would not protect Layton from post merger layoffs when it entered into an implied contract with Layton not to terminate him in the post merger round of layoffs.

3.   CONCLUSION.

For all of the foregoing reasons, this court should deny DIMA's motion for summary judgment or, if the motion is not denied, should defer ruling on the motion pursuant to Fed. R. Civ. P. 56(f) until

Layton has had the opportunity to conduct additional necessary discovery.

                                  JOHN R. LAYTON, plaintiff,
                                  By his attorneys,

                                  BARRON & STADFELD, P.C.

                                  /s/ Kevin F. Moloney
                                  Kevin F. Moloney     BBO No. 351000
                                  Roger T. Manwaring  BBO No. 548614
                                  100 Cambridge Street, Suite 1310
                                  Boston, Massachusetts 02114
                                  Tel.: 617.531.6569

                                  and
                                  /s/ John K. Weir
                                  John K. Weir, admitted PHV
                                  John K. Weir Law Offices, LLC
                                  300 Park Avenue, Suite 1700
                                  New York, New York 10022
                                  Tel.: 212.572.6374

Dated: February 16, 2002

<u>Certificate of Service</u>.

     This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF); and to co-counsel for plaintiff, John K. Weir, via e-mail.

                                  /s/ Kevin F. Moloney

Dated: February 16, 2006

[348165]