UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * * * * * * * * * * * * *
                                    *
John R. Layton,                     *   BBO No. 351000
                                    *
        Plaintiff,                  *
                                    *   Response
v.                                  *   of
                                    *   Plaintiff John R. Layton
                                    *   to
Deutsche Investment Management      *   "Defendant's Statement
Americas, Inc.,                     *   of Undisputed Facts"
                                    *
        Defendant.                  *   revised 2006 02 16
                                    *   02 23 pm
* * * * * * * * * * * * * * * * * * * * * * * * * * *
```

Plaintiff John R. Layton ("Layton") responds to defendant Deutsche Investment Management Americas Inc. ("DIMA")'s "Statement of Undisputed Facts," filed by DIMA in support of its Motion for Summary Judgment. This response, together with Layton's Opposition to the DIMA Motion for Summary Judgment, his Memorandum in Support of his Opposition and related papers filed herewith, demonstrate that there are genuine issues of material fact and that DIMA is not entitled to summary judgment.

1. DIMA Statement: Layton was born on September 1, 1954. (Complaint ¶ 6.)

    Layton Response: Agreed.

2. DIMA Statement: Layton began working as an Investment Advisor in the Boston office of Scudder, Stevens & Clark on September 26, 1994, and remained with the firm after it was acquired by Zurich Insurance in 1997 and renamed Zurich Scudder Investments, Inc. ("Scudder"). (Layton 10-11; Saltonstall 22.)

    Layton Response: Agreed.

3. DIMA Statement: On April 8, 2002, Deutsche Bank acquired Scudder and, as a result, Layton became an employee of DIMA. (Answer ¶¶ 8, 15; Layton 11.)

    Layton Response: Agreed but incomplete as Layton became a Managing Director

of DIMA.  See Layton's Statement of Fact filed herewith ("Layton Statement of Fact"), ¶.6 .

4. <u>DIMA Statement</u>: At the time of the transaction, Layton held the corporate title of Managing Director, though his functional responsibility remained that of an Investment Advisor. (<u>Layton</u> 10-11.)

   <u>Layton Response</u>: Disputed as Layton became a member of the Equity Strategy Group ("ESG") and in August 2002 he became the Co-Chair of the ESG.  <u>See</u> Layton Statement of Fact, ¶¶ 9, 19-26.

5. <u>DIMA Statement</u>: DIMA is a wholly-owned subsidiary of Deutsche Bank Americas Holding Corporation, which is ultimately a subsidiary of Deutsche Bank, A.G. (<u>Answer</u> ¶ 6.)

   <u>Layton Response</u>: Agreed.

6. <u>DIMA Statement</u>: Among its array of financial services, DIMA offers investment management services to high net worth individuals through its Private Wealth Management ("PWM") organization. PWM is divided into several distinct internal groups, including the Investment Advisory Division in which Layton worked as an Investment Advisor. (<u>Miscinski</u> 35-37)

   <u>Layton Response</u>: Disputed as Layton worked in the Private Client Group as a Portfolio Manager and after April 8, 2002, also undertook responsibilities within the ESG for the entire Private Wealth Management Group ("PWMG") of DIMA  <u>See</u> Layton Statement of Fact, ¶ ¶9, 19-26 and 30.

7. <u>DIMA Statement</u>: G. West Saltonstall, who had also been a Managing Director in Scudder's Boston office, became one of the Regional Managers within the Investment Advisory Division following the acquisition by DIMA. In that role, he was responsible for supervising Layton and the other Investment Advisors in the Boston office. (<u>Saltonstall</u> 23-25; <u>Miscinski</u> 21, 39.)

   <u>Layton Response</u>: Agreed with respect to the first two lines through the word "Managers," but otherwise disputed . <u>See</u> also the response to No. 6, above.

8. <u>DIMA Statement</u>: Saltonstall, whose date of birth is January 22, 1944, is ten years older than Layton. (<u>Ex.</u> D.)

   <u>Layton Response</u>:  Agreed but not relevant.  Fed. R. Civ. P. 56  requires "admissible evidence."

9. <u>DIMA Statement</u>: Saltonstall was also designated to chair the Investment Management Committee ("IMC"), which was comprised of other Regional Managers within the Investment Advisory Division, as well as the Division's

2

Business Manager, Kurt Miscinski. Gloria Nelund, then head of sales and marketing for PWM, also attended IMC meetings. (See Saltonstall Dep. at 25-28; Miscinski 78-79.)

Layton Response: Disputed in part as to use of the word "also" and as to the reference to the term "Investment Advisory Division." See the response to No. 7, above.

10. DIMA Statement: At the time of the Scudder acquisition by DIMA and continuing throughout his tenure at DIMA, Layton openly expressed to Saltonstall and other colleagues his unhappiness about being part of DIMA, and his opinion that the Scudder business could not succeed within Deutsche Bank. (Saltonstall 99-101, 238-40; Miscinski at 115-16, 130.)

Layton Response: Disputed as incorrect and incomplete. Moreover, the statement ignores the fact that Saltonstall himself, repeatedly expressed his unhappiness about the DIMA acquisition of Scudder, and sought other employment. See Layton Statement of Fact, ¶¶ 19, 20, 21, 21A, 22, 23, 24, 29 and 30.

11. DIMA Statement: At the time of the Scudder acquisition, DIMA offered a special performance incentive award to a select group of employees within the Investment Advisory Division, including Layton. The award, as described in a letter to Layton dated April 1, 2002, would consist of cash and equity to be made on or before October 14, 2003. According to the letter, Layton would have to be actively employed by DIMA on the date of payment in order to be eligible for the award. The letter further required Layton to agree that he would "return any and all information relating to clients and employees of Deutsche Bank" should he terminate his employment for any reason. (Grohowski 32, 39-40; Ex. F.)

Layton Response: The letter speaks for itself and disputed insofar as the statement may suggest that Layton's employment could be terminated involuntarily. Disputed also as incomplete in that the it was not the only promise made to Layton at the time of the acquisition to induce him to stay with DIMA. Layton Statement of Fact, ¶¶ 8-12.

12. DIMA Statement: Layton never signed and returned the April 1, 2002, letter to DIMA. (Layton 67-68.)

Layton Response: Agreed but not relevant. Fed. R. Civ. P. 56 requires "admissible evidence."

13. DIMA Statement: DIMA's senior management was aware that Layton did not sign the letter, contributing to the perception that Layton did not wish to remain at DIMA. (Grohowski 41-43; Miscinski 170.)

Layton Response: Disputed as to the existence of the perception referred to based

3

upon Layton's not signing the letter. See Layton Statement of Fact, ¶ 8 - 12, and 21 -24.  Moreover, the deposition testimony referred to does not support the statement.

14. DIMA Statement: In May 2002, DIMA employees were asked to read and acknowledge their obligations under a Code of Ethics. On May 13, 2002, Layton sent an e-mail to DIMA officials stating that he refused to be bound by a provision of the Code of Ethics that would prohibit him from soliciting DIMA's clients and employees while employed by DIMA and for a period of 12 months following termination of employment. (Layton 34, 37-38; Ex. G; Ex. H.)

    Layton Response: Disputed as Layton was allowed to opt out of the provision referred to at the specific direction of Nelund, and others who were not terminated as Layton was, were told that they should do the same thing. See Layton Statement of Fact, ¶ 15A . __.

15. DIMA Statement:  Saltonstall and other DIMA managers were aware that Layton had been actively seeking other employment following DIMA's acquisition of Scudder. (Layton 23-24; Saltonstall 99-100; Grohowski Dep. at 23-24, 26-27.)

    Layton Response: Disputed as incomplete and inaccurate.  Moreover, Saltonstall himself sought other employment. See Layton Statement of Fact, ¶21-24, 29 and 71.  Disputed for lack of a statement of the time period and because Layton, not later than August 2002, had committed himself to staying with DIMA.  Layton Statement of Fact, ¶¶ 19-24.

16. DIMA Statement:  Beginning in the spring or early summer of 2002, Layton interviewed with Lee Munder Capital Group ("LMCG") regarding the possibility of leaving DIMA to work there. These communications culminated with LMCG extending an employment offer to Layton and two other DIMA employees from the Boston office, Deborah Moses and Roy Duke. Because the offer was conditioned on acceptance by all three of these individuals, it was ultimately withdrawn once Moses decided to reject it and stay with DIMA. (Layton 15-17, 20-21.)

    Layton Response: Disputed as incomplete and misleading in that Saltonstall himself sought other employment and by the time of Layton's August 2002 discussion with Grohowski, Layton had ceased all efforts to obtain other employment and had committed himself to the new dual responsibilities to which he had been assigned by DIMA.  See Layton Statement of Fact, ¶ 19 - 24 and 29.  The statement also is not relevant as neither Moses nor Duke were included in the November 2002 terminations. See Layton Statement of Fact, ¶ 21B.  Fed. R. Civ. P. 56  requires "admissible evidence."

17. DIMA Statement: Layton also interviewed with Stein Roe Investment Counsel in mid-2002 regarding the possibility of employment there. (Layton 50-54.)

4

Layton Response: Disputed as to ambiguity of the time period of "mid-2002" See the response to No,. 16, above.

18. DIMA Statement: In addition, Plaintiff testified at his deposition that he believes he may have interviewed for a position at Brown Brothers Harriman during that period. (Layton 62.)

Layton Response: Disputed as to the words "during that period." See the response to Nos. 16,and 17, above.

19. DIMA Statement: During the time that Layton was employed by DIMA, he experienced a high volume of net outflows of assets from his accounts, as well as a number of client terminations, which both contributed to loss in revenues. (Saltonstall 99-100, 230-40; Miscinski 114-16, 169-72.)

Layton Response: Disputed as false on a comparative basis. See Layton Statement of Fact, ¶¶ 59, 60, 61.

20. DIMA Statement: During the time that Layton was employed by DIMA, Saltonstall received complaints from several of Layton's clients, and DIMA was threatened with a lawsuit by another of Layton's clients. (Saltonstall 99-100, 230-40; Miscinski 114-16, 169-72.)

Layton Response: Disputed as misleading and incomplete for lack of a showing of the context as to other similarly situated DIMA officials. Insofar as documents from the August-September time period have been withheld by DIMA on the grounds of privilege and such documents concern the "threaten[ed]" law suit or any of the alleged "complaints" referred to, the court should draw a negative inference against DIMA

21. DIMA Statement: In the late summer of 2002, it became apparent that PWM was not going to meet its financial plans for the year and that PWM, as then constructed, would have difficulty meeting its objectives in future years. Consequently, DIMA determined that it needed to reduce expenses in PWM. (Grohowski 62-63.)

Layton Response: Disputed as the statement does not indicate to whom the information became apparent and who at DIMA determined it to be "necessary" Based upon the testimony to date, Pierre deWeck of Deutsche Bank was the person responsible for giving direction to DIMA. See Layton Statement of Fact ¶¶ 31-34. The deposition of deWeck was not among the depositions taken to date because DIMA failed to identify deWeck as a person with knowledge in DIMA's "Fed. R. Civ. P. 26(a) (1) Initial Disclosures."

22. DIMA Statement: As part of its cost reduction effort, DIMA decided to eliminate positions in the Investment Advisory Division, thereby saving compensation and

benefits costs. (Grohowski 57-58, 62-64.)

Layton Response: Disputed as to the use of the term "Investment Advisory" unit and also as to whether DIMA's decision to eliminate positions was limited to the "Investment Advisory Division." See the Affidavit of David R. O'Hara ("O'Hara affidavit") filed herewith; Layton Statement of Fact ¶¶57-64. See also the response to No., 21, above.

23. DIMA Statement: On September 11, 2002, Leo Grohowski, who was then the Chief Investment Officer for PWM, wrote an e-mail to members of the IMC, instructing them to develop a plan to reduce head count in the Investment Advisory Division by $2.5 million and to have a recommendation to him by the end of the month. (Grohowski 72-75; Ex. I.)

Layton Response: Agreed except to the reference to " Investment Advisory Division," and disputed in that Grohowski also had other DIMA responsibilities in 2002. Layton Statement of Fact, ¶ 8. See the responses to Nos. 21 and 22, above. . Moreover the document speaks for itself.

24. DIMA Statement: In developing a plan to reduce head count, the IMC determined that the Boston office could withstand a reduction in its complement of Investment Advisors because it had excess investment-advisory capacity relative to its generation of new business. (Miscinski 80-84; Saltonstall 113-14.)

Layton Response: Disputed. Compare DIMA doc.01349 referred to in Layton Statement of Fact ¶ 31 with the above statement. Moreover the testimony referred to does not support the statement. Layton was one of the top two producers in the Boston office. See Layton Statement of Fact, ¶ 43.

25. DIMA Statement: The IMC reviewed extensive statistical information about each Investment Advisor, and relied on input from the Regional Managers who were most familiar with the individuals from the various offices. (Miscinski 80, 88-90, 121-22; Saltonstall 69-71, 84-85.)

Layton Response: Disputed insofar as the statement fails to state that included in the "extensive statistical information" was the date of birth of each person reviewed. See the attachment to the October 21, 2002, e-mail from Maloney to Nelund and others. Rubin affidavit Exhibit J.

26. DIMA Statement: Over the course of a few weeks, the IMC generated and revised several lists of possible terminations. (Miscinski 89-91.)

Layton Response: Disputed insofar as the statement fails to state that at least one n of the DIMA "lists" included date of birth information. See Layton Statement of Fact, ¶ 40-41. See also the response to No. 25, above.

6

27. <u>DIMA Statement</u>:  The earliest versions of the possible termination list included only more junior, lower-paid Investment Advisors. When it became clear that this approach would not yield sufficient savings, the IMC began to give greater consideration to the more highly paid Investment Advisors who held the position of Managing Director. (<u>Miscinski</u> 93, 96-97, 100, 105-07; <u>Saltonstall</u> 126-28.)

   <u>Layton Response</u>: Disputed as inaccurate as Layton was the only or one of only two Managing Directors who were terminated.  Exhibit A to  Rubin affidavit Exhibits N and O (including Exhibit A thereto) .  Saltonstall was not considered for termination during the time period referred to in the statement. <u>See</u> Layton Statement of Fact, ¶ 37-38.  <u>See</u> also the O'Hara affidavit.

28. <u>DIMA Statement</u>:  A draft termination list from October 21, 2002, included three Investment Advisors from Boston, all below the level of Managing D$^i$rector: Vice President Edward Bliss (age 71), Vice President Eileen Buckley (age 49), and Leonard Dolan (age 36). (<u>Miscinski</u> 90-96; <u>Ex.</u> J.)

   <u>Layton Response</u>:  Disputed as to the use of the word, "draft." The list was not a "draft."  The testimony referred to does not support the statement.

29. <u>DIMA Statement</u>: Saltonstall recommended to the IMC that Layton be added to the termination list for a number of reasons, including but not limited to:

    Layton's termination would result in significant cost savings, as he was far more highly paid than the lower-level Investment Consultants on the earlier draft lists.

    Layton had been extremely vocal about his negative outlook towards DIMA and the efforts to integrate the Scudder and DIMA organizations.

    Layton had attempted to leave DIMA for LMCG earlier in the year and Saltonstall believed that would leave DIMA at the next available opportunity.

    Saltonstall did not believe that Layton would be able to take significant business away from DIMA. Layton had experienced a high volume of net outflows of assets from his accounts, as well as a number of client terminations, which both contributed to loss in revenues.

    Saltonstall had received recent complaints from several of Layton's clients, and DIMA was being threatened with a lawsuit by another of Layton's clients.

(<u>Saltonstall</u> 99-100, 230-40; <u>Miscinski</u> 114-18, 169-72.)

<ins>Layton Response</ins>: Disputed as Saltonstall as of October 21, 2002, had recommended that Leonard Dolan ("Dolan"), a young Portfolio Manager, be on the termination list and did not recommend that Layton be on that list. However, after receipt of the Dolan memorandum, Saltonstall recommended that Dolan be removed from the termination list for the reasons set forth in Dolan's memorandum to Saltonstall (the "Dolan memorandum") and that Layton, a much older and far more profitable Portfolio Manager, be added to the termination list in Dolan's place. <ins>See</ins> Layton Statement of Fact, ¶ 47-53.

30. <ins>DIMA Statement</ins>: Based upon Saltonstall's recommendations, sometime after October 21, 2002, Bliss and Dolan were removed from the list and Layton was added. (<ins>Saltonstall</ins> 204-05, 217-18; Miscinski Dep. at 146-48, 168-71; <ins>Ex.</ins> K.)

    <ins>Layton Response</ins>: Disputed . <ins>See</ins> response to No. 29, above. Moreover, the statement it is incomplete as Bliss and Dolan were removed from the termination list for entirely different reasons -- Bliss because he was retiring and becoming a consultant to DIMA. <ins>See</ins> Layton Statement of Fact, ¶ 50.

31. <ins>DIMA Statement</ins>: At some point during the time that the IMC was working on its plan to reduce head count, Saltonstall forwarded to Gloria Nelund a note that Saltonstall had received from Investment Advisor Leonard Dolan entitled "9 Reasons to Keep Me." In an apparent attempt to be humorous, Dolan listed nine reasons why he should not be terminated, including "Youngest in Boston - by almost 10 years." Dolan was not a member of the IMC and there is no evidence that his note was considered by the IMC in making its decisions. (<ins>Nelund</ins> 60-67; <ins>Ex.</ins> M.)

    <ins>Layton Response</ins>: Agreed as to the first sentence but disputed as to the purported attempt to characterize the entire Dolan memorandum as an "attempt to be humorous" as even Saltonstall in his cover memo sending the Dolan memorandum to Nelund, admitted that it showed the "level of nervousness" in the Boston office. <ins>See</ins> Layton Statement of Fact, ¶ 48. The characterization and the context of this document is for the jury to decide  While Dolan was not a member of the IMC, Saltonstall and Nelund were participants in the meetings. There is no evidence in the record that Saltonstall or Nelund or any other person at DIMA disclaimed reliance on the Dolan memorandum.

32. <ins>DIMA Statement</ins>: On November 19, 2002, Saltonstall and David Denaro, who was then a Senior Human Resources Advisor working in DIMA's Boston office, met with Layton to inform him that his employment would be terminated effective November 29, 2002. (<ins>Layton</ins> 78-80; <ins>Ex.</ins> N.)

    <ins>Layton Response</ins>: Agreed that Layton was told at that time that he was being terminated but disputed as incomplete as there were other things said by the participants. <ins>See</ins> Layton Statement of Fact, ¶¶ 67-74.

8

33. <u>DIMA Statement</u>: At the termination meeting on November 19, 2002, Saltonstall and Denaro presented Layton with a memorandum and proposed letter-agreement describing a "Separation Package" offered by DIMA. The letter-agreement included on Exhibit A listing the job titles and ages of employees in the Investment Advisory Division who had and had not been selected for termination. (<u>Layton</u> 78-80; <u>Ex. N;</u> <u>Ex. O.</u>)

    <u>Layton Response</u>: Agreed as to the first sentence but disputed as to whether Exhibit A was a complete list of titles and ages of the employees at DIMA in the PWMG who had or who had not been terminated in the period June 1, 2002 - November 19, 2002. <u>See</u> the O'Hara affidavit. Disputed also as to use of the term "Investment Advisory Unit."

34. <u>DIMA Statement</u>: Under the Separation Package, Layton received a severance payment of $213,687.00, representing twenty-seven weeks of compensation. There is no dispute that DIMA made this severance payment to Layton. (<u>Layton</u> 92-93; <u>Ex. N</u>.)

    <u>Layton Response</u>: Agreed.

35. <u>DIMA Statement</u>: As part of the Separation Package, DIMA offered Layton an additional $244,014.00 as a Special Performance Incentive award similar to that described in April 1, 2002 letter <u>(Ex. F)</u> that Layton had never accepted. Payment of this Special Performance Incentive Award was contingent on Layton signing the letter-agreement, which included a release of claims. The letter-agreement also contained provisions that would have prohibited Layton from soliciting employees and existing or prospective clients of DIMA for one year following his termination date. (<u>Layton</u> 93-94; <u>Ex. N;</u> <u>Ex.</u> O.)

    <u>Layton Response</u>: Disputed insofar as the offer was withdrawn by Denaro in late December 2002 prior to the expiration of the 45-day period referred to in the letter. <u>See</u> Layton Statement of Fact, ¶ 86.

36. <u>DIMA Statement</u>: Layton understood that he was not entitled to receive the $244,014.00 Special Performance Incentive award unless he signed the letter-agreement. (<u>Layton</u> 96.)

    <u>Layton Response</u>: Agreed but not relevant as Layton signed the agreement as described in Layton Statement of Fact, ¶ 87, and no such payment was made. Layton Statement of Fact, ¶ 88.

37. <u>DIMA Statement</u>: On November 23, 2002, just a few days after learning of his termination and while still an employee of DIMA, Layton sent letters to approximately 500 of his client contacts to inform them of his departure from DIMA. (<u>Layton</u> 102-05; <u>Ex.</u> P.)

Layton Response: Disputed as Layton had not solicited any of his DIMA clients' business as of the date of the withdrawal by Denaro of the offer. Layton Statement of Fact ¶¶ 82, 83 and 87. Moreover, Layton, in May 2002, had been allowed to opt out of the non-solicitation provision of the DIMA Code of Ethics Id.

38. DIMA Statement: Given that Layton had already solicited customers in violation of the proposed letter-agreement, Denaro informed Layton that DIMA's offer of the Special Performance Incentive award would be withdrawn. (Layton 101.)

   Layton Response: Agreed that the offer was withdrawn by Denaro but disputed as to the reasons claimed in the statement. See the responses to Nos. 37 and 38, above. .

39. DIMA Statement: Layton crossed out the non-solicitation provisions of the letter-agreement, signed it "as amended," and mailed it to DIMA on or about December 31, 2002. DIMA did not accept this counteroffer. (Layton 106; Ex. O.)

   Layton Response: Agreed as to the first sentence. The second sentence sets forth a conclusion or opinion of law and therefore is not a proper part of a statement of "fact."

40. DIMA Statement: Layton sent another letter to his client contacts on January 3, 2003 to announce that he had accepted a new position with LMCG. (Layton 112; Ex. R.)

   Layton Response: Agreed but see the responses to Nos. 37 and 38, above . Moreover, the letter speaks for itself

41. DIMA Statement: Of the nine individuals terminated from the Investment Advisory Division November 19, five were younger than Layton, and three of the five were under the age of forty. (Ex. 0.)

   Layton Response: Disputed as Layton contends that more than nine were terminated from DIMA, including, without limitation, the PWMG, in the period since June 1, 2002. See the O'Hara affidavit.

42. DIMA Statement: The two Managing Directors who were retained in the Boston office - Saltonstall (age 58) and Moses (51) - were older than Plaintiff. Edward Bliss, whose name was deleted from the termination list at around the time that Layton's was added, was 70 years old. The other Investment Advisors retained within the Boston office had the following ages: Samuel Perry (age 59); Susan Maitland (53), Jonathan Treat (age 51), and Leonard Dolan (age 35). (Ex. D.)

   Layton Response: Disputed, as the much older Layton was substituted for the

10

much younger Dolan on the termination list. The Dolan memorandum points out that Dolan was the "youngest" at the Boston office. Bliss' name was removed from the termination list when it was learned that he was retiring and becoming a consultant to DIMA. See Layton Statement of Fact, ¶ 55.

43. DIMA Statement: Following Layton's termination, Saltonstall reallocated the accounts Layton had serviced to other Investment Advisors in the Boston Office: Jonathan Treat (age 51), Susan Maitland (age 53), Leonard Dolan (age 35), and Samuel Perry (age 59). (Saltonstall 218-19; Ex. D; Ex. S.)

   Layton Response: Disputed as Layton's ESG responsibilities as Co-Chair were given over to a significantly younger person, Owen Fitzpatrick, the other Co-Chair. See Layton Statement of Fact, ¶ 85.

44. DIMA Statement: A small number of Layton's former accounts were assigned to Director Ronald Bates (age 40) in the Cincinnati office, Vice President Monika Panger (age 43) in the Philadelphia office, Vice President John Heldman (age 44) in the Costa Mesa office, and Director Douglas Nardi (age 38) in the Chicago office. (Ex. D; Ex. S.)

   Layton Response: Not relevant to the issue of whether there was age discrimination in connection with the termination of Layton on November 19, 2002.

45. DIMA Statement: A few of Layton's smallest accounts were transferred to the Structured Portfolio Management Group ("SPMG"), a new group established within the Investment Advisory Division in late 2002 to centrally manage relatively small-value client accounts. (Saltonstall 156; Ex. S.)

   Layton Response: Not relevant to the issue of whether there was age discrimination in connection with the termination of Layton on November 19, 2002.

46. DIMA Statement: On September 15, 2003, Layton filed a charge with the Equal Employment Opportunity Commission ("EEOC") in which he alleged that DIMA had discriminated against him on the basis of his age. (Layton 127; Ex. T.)

   Layton Response: Agreed.

47. DIMA Statement: The EEOC issued a Notice of Dismissal of Layton's charge on December 18, 2003 on the grounds that "the evidence fails to indicate that a violation of the law occurred and it is not likely that additional investigation will result in our finding of a violation." (Layton 140; Ex. U.)

   Layton Response: The Notice should not be considered by the court on this motion for summary judgment. Consideration of this document is

discretionary. <u>Smith</u> v. <u>M.I.T.</u>, 897 F2d 1106 (1st Cir. 1989); <u>Patten</u> v. <u>Wal-Mart Stores East, Inc</u>., 300 F3d 21 (1st Cir. 2002). It should not be considered because there is an issue as to whether the information supplied by DIMA to the EEOC was accurate and complete. Layton contends that it was not accurate and complete . <u>See</u> the DIMA position statement to the EEOC, which does not include as being furnished to the EEOC the Dolan memorandum or the October 21, 2002, termination list with Dolan's name on it. <u>See</u> also the O'Hara affidavit.

        JOHN R. LAYTON, plaintiff,

        By his attorneys,

        BARRON & STADFELD, P.C.

        /s/ Kevin F. Moloney
        Kevin F. Moloney  BBO No. 351000
        100 Cambridge Street, Suite 1310
        Boston, Massachusetts 02114
        Tel.: 617.531.6569

        and

        /s/ John K. Weir
        John K. Weir, admitted PHV
        John K. Weir Law Offices, LLC
        300 Park Avenue, Suite 1700
        New York, New York 10022
        Tel.: 212.572.6374

Dated: February 16, 2002

<u>Certificate of Service</u>.

  This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF); and to co-counsel for plaintiff, John K. Weir, via e-mail.

        /s/ Kevin F. Moloney

Dated: February 16, 2006

[348___.1]