UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| John R. Layton, | BBO No. 351000 |
| Plaintiff, | |
| | Plaintiff John R. Layton's |
| v. | Counter Statement |
| | of |
| Deutsche Investment Management Americas, Inc., | Relevant Facts |
| Defendant. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

In support of his opposition to the motion for summary judgment of defendant Deutsche Investment Management Americas, Inc, ("DIMA"), plaintiff John R. Layton ("Layton") submits this Counter Statement of Relevant Facts:

1. Born on September 1, 1954, plaintiff John R. Layton ("Layton") was 48 years old when, on November 19, 2002, his employment by defendant Deutsche Investment Management Americas, Inc. ("DIMA") in its Private Wealth Management Group ("PWMG") was terminated. Layton deposition ("dep."), 6, 11 and 79.

2. Layton obtained a Bachelor of Arts degree from Kenyon College and a Master's degree from the University of Michigan. Layton dep. , 7..

3. He became a Chartered Financial Analyst in 1991 or 1992 while he was working for Fiduciary Trust Company. Layton dep., 7-10

1

4. In 1994, Layton was hired by Scudder, Stevens & Clark, ("Scudder") of Boston as an Investment Advisor. He became a Certified Investment Counsel after he joined Scudder. Layton dep. , 8-10, 63._.

5. He was promoted to Managing Director of Scudder shortly after its acquisition by Zurich Insurance in 1997. Layton dep., 10-11.

6. In April, 2002, Deutsche Bank ("Deutsche Bank") acquired Scudder from Zurich Insurance and Layton remained in his Managing Director capacity. Layton dep., 11.

7. Deleted.-

8. In early April, 2002, Leo Grohowski ("Grohowski"), a Deutsche Bank principal with responsibility for the PWMG, came to Boston and met individually with each of the Portfolio Managers in the Private Client Group ("PCG"), including Layton. Grohowski dep. 26-29.

9. During that meeting, Grohowski made promises to Layton to induce Layton to stay on with Deutsche Bank, including a promise that in addition to continuation of Layton's portfolio management duties, Layton would be given additional responsibilities as a member of Deutsche Bank's Equity Strategy Group (the "ESG"), which was being established to develop a rational stock selection process for the entire PWMG. Grohowski dep., 26-29.

10. Layton understood from his discussions with Grohowski that his compensation at DIMA would be enhanced if he accepted this dual role in the merged entity. Layton dep. 70.

11. Grohowski spent extra time meeting with Layton and Deborah Moses ("Moses"), a Managing Director , because Grohowski had heard through G. West Saltonstall

("Saltonstall"), Scudder's Regional Manager in Boston that both Layton and Moses were considering alternative employment. Grohowski dep., 23-24.

12. In specific response to this concern, and to capitalize upon their "skill sets," Grohowski offered Layton the ESG position and offered Moses a position on the Asset Allocation Committee. Layton dep., 75; Grohowski dep., 26-29

13. By letter, dated April 1, 2002 (the "April 1 letter") Grohowski also offered to Layton and others identified as part of a "select group" of Scudder Portfolio Managers, the opportunity to participate in a special performance incentive award of cash and equity payable on October 14, 2003, to be based upon assets under management at that time. Rubin Affidavit Exhibit F.

14. The April 1 letter further required that offerees who accepted the offer to be actively employed by DIMA on October 14, 2003. Rubin Affidavit, Exhibit F.

15. Layton elected not to sign an acceptance of the terms of the April 1 letter because he considered the performance incentive to be "overly mercenary" in that he did not believe it to be appropriate to tie his compensation at a specific future date to the performance of his clients' accounts, and that he did not need such an incentive to continue doing good work for his clients after the acquisition. Layton dep., 67-74

15A. Layton was allowed to opt out of the non-solicitation provision of the DIMA Code of Ethics at the specific direction of Nelund, and others who were not terminated as Layton was, were told that they should do the same thing. _____

16. At the time of the acquisition of Scudder, Deutsche Bank knew that the financial markets were deteriorating. Grohowski dep., 37. In the weeks and months following the acquisition, there were "lots" of terminations of personnel. Layton dep., 64.

       Layton believed that Deutsche Bank had purchased Scudder with the desire to eliminate positions so as to make it more profitable. Layton dep., 64-65.

17. Accordingly, Layton believed that the Scudder work force had many more people who were older than the people were in the Deutsche Bank work force, especially in senior positions, and that Deutsche Bank looked at Scudder as an opportunity to become more profitable by eliminating these positions. Layton dep., 64-654

18. Despite this awareness, Deutsche Bank never communicated to Layton that he was considered other than a stellar performer or that his decision to decline to participate in the Special Performance Incentive program could have an adverse impact on his career. Layton dep., 82.

19. After the April 8, 2002, acquisition by Deutsche Bank of Scudder, Layton accepted employment at Deutsche Bank's affiliate, defendant DIMA, in a dual role as a Portfolio Manager in the Private Client Group and as a member of the Equity Strategy Group, and continues in those roles without interruption until the sudden termination of his DIMA employment on November 19, 2002. Layton dep., 11, 70-78.

20. During that period, Layton performed both Portfolio Management responsibilities in DIMA's Private Client Group and stock selection duties of its PWMG as a member of the ESG. Layton dep., 11, 70-78.

21. In August 2002, one or two months after an alternative employment opportunity at Lee Munder Capital Group ('LMCG") offered as a package deal to Layton, Moses and W. Roy Duke had been withdrawn, Layton dep., 15-19, 24, Grohowski told Layton that Layton would be "crazy" to consider other employment. Layton dep., 23-25.

21A. Neither Moses nor Duke was included in the November 2002 terminations. Rubin affidavit Exhibit O, Exhibit A thereto.

22. Grohowski also told Layton at this time hat if Layton could convince him of his "commitment" to DIMA and the PWM Group, Grohowski would consider promoting Layton to be Co-chair of the ESG and would enhance his compensation to reflect his significant new duties and responsibilities during the DIMA compensation discussions to take place in early 2003. Layton dep., 23-25, 70-76..

23. Layton responded to Grohowski that he (Layton) was committed to DIMA for the long term, and that he believed that he added substantial value to DIMA and was a person who should be retained. Layton, dep., 154.

24. In August 2002, as a result of this discussion, Grohowski promoted Layton to Co-chair of the ESG, sharing duties with the other Co-chair, W. Owen Fitzpatrick ("Fitzpatrick"), was a significantly younger Portfolio Manager from the Deutsche Bank side. Layton dep., 76-77

25. Layton commenced his duties as ESG Co-Chair in August 2002, and devoted a significant amount of work time (over ten hours per week) after his promotion to ESG Co-chair responsibilities. Layton dep.,78-83, 88-89.

26. In the weeks and months following the April 2002 Deutsche Bank acquisition of Scudder, there were significant numbers of terminations of personnel throughout Deutsche Bank's operations in the United States. Layton dep., 64-65.

27. Layton and many others came to believe that Deutsche Bank had acquired Scudder with the specific intent to eliminate positions. Layton dep., 64-65, 155.

28. At one point, terminations became so rampant that employees were lined up outside the offices of the DIMA Human Resources Department ("HRD") waiting to o in to HR to have the "conversation". Layton dep., Layton dep., 155.

29. Nevertheless, Layton never received any indication that his dual job performances had been or were being viewed by DIMA as anything other than exemplary, , or that he was not considered to be a "team player." Layton dep., 80-82.

30. Layton's promotion and the promise of enhanced compensation from Grohowski assuaged any concerns that Layton otherwise might have had about DIMA's awareness that he had considered alternative employment opportunities prior to, and shortly after, the acquisition of Scudder. Layton dep., 154.

31. On or about September 12, 2002, Grohowski sent an e-mail to other members of DIMA's top management, Gloria Nelund ("Nelund") and Kurt Miscinski ("Miscinski") as well as to the members of the DIMA Investment Management Committee ("IMC"), then chaired by Saltonstall, stating,

> We have 57 Portfolio Managers and too many with substandard books. We need to become more efficient in managing the smallest accounts, while moving larger accounts to our most capable [Portfolio Managers] who have some capacity and whose AUMs [assets under management] have deteriorated with market performance.

DIMA document (DIMA doc.") 01349.

32. Grohowski thereupon asked the IMC to recommend a plan to reduce the headcount and costs associated with "portfolio management" by $2,500,000 for the '03 plan. Id.

33. Grohowski had received the dollar amount from reduction target from Paul Higgins, a U.S. based executive who was about to retire from DIMA. Grohowski dep. __

34. Higgins, in turn, had received his direction from Pierre deWeck, a London based executive of Deutsche Bank to whom a presentation concerning the U.S. based Portfolio Managers had been made in New York City in early September 2002. Grohowski dep., __

35. On or about September 18, 2002, the IMG began a series of during which the members considered, among other issues, ways to comply with Grohowski's directive. Saltonstall dep. . __.

36. Deleted.

37. During these meetings, all of the Portfolio Managers were discussed, even those, including Saltonstall, who were members of the IMG. Miscinski dep., , __.

38. Very shortly after the meetings began, the members taking a look "from the top down", eliminated Saltonstall as a candidate for termination. Miscinski dep., ___.

39. Deleted.

40. By on or about October 21, 2002, the IMG created a list (the "termination list") of proposed terminees (Rubin Affidavit, Exhibit J), and then the DIMA HRD, through James Maloney ("Maloney"), the HR representative for the PWM Group disseminated the list to DIMA top management.. Rubin affidavit, Exhibit N.

41. The termination list included 13 names, three of which were Portfolio Managers from the Boston office, Edward Bliss (age 71), Eileen Buckley (age 49) and Leonard Dolan (age 36). Id.

42. None of them were Managing Directors, and none were at all involved in the ESG. Id.

43. Neither Layton's name nor that of Moses, the two top financial performers in the Boston office, was on the termination list. Id , Layton dep. __.

7

44. Notably, as forwarded on to DIMA's top management by Maloney the termination list included the "age as of December 31, 2002" of each of the proposed terminees. Rubin affidavit, Exhibit N.

45. According to the document, the terminations proposed in the termination list would result in a savings of $1,697,082. Id.

46. In his cover e-mail, Maloney advised Miscinski that "[i] we wish to move forward with communications during the first week of November, we will need a finalized list by the end of the week." Id.

47. At some point after dissemination of the termination list, Dolan became aware that his name was on it. Nelund, dep., Exhibit 1.

48. Dolan then drafted a memorandum sending it on to Saltonstall with the caption, "9 Reasons To Keep Me" (the "Dolan memorandum"). Nelund dep., Exhibit 1.

49. The Dolan memorandum, which had been filed in Nelund's file at DIMA was not produced to Layton's counsel until 5:30 p.m. of the evening before Nelund's deposition on June 14, 2005. Nelund dep., ___. This was after the end, on June 2, 2005, of the Saltonstall deposition.

50. Included among the reasons stated in the Dolan memorandum for taking his name off the termination list were:

   1. One of the least expensive consultants;

   2. "Youngest in Boston by almost 10 years;...

   3. Continuity: Can preserve the values and train generations 10+ years after current staff is retired....

Nelund dep., Exhibit 1_____, ____.

51. The Dolan memorandum added as another reason for taking his name off the termination list was that Dolan did not have many accounts and thus would have significant "capacity." <u>Id</u>.

52. Upon his receipt of the Dolan memorandum, Saltonstall sent it on up to his superior, Nelund. <u>Id</u>..

53. By the time of the next IMC meeting on November 5, 2002, and quite possibly as early as October 27, 2002 (see _____), Dolan's name was removed from the termination list and Layton's name was added.

54. Buckley's name remained on the termination list. _____

55. Bliss' name was removed from the termination list but only because it was learned that he was retiring and was becoming a consultant to DIMA under a contract. _____, ___.

56. There is no evidence in the record to show that a meeting of the IMC occurred between October 21, 2002, and November 5, 2002.

57. There is no evidence in the record to show any change in circumstance or performance concerning Layton in that period.

58. While the IMC claimed to have considered a number of performance factors in the decisions on prospective terminees, <u>e</u>.<u>g</u>. client terminations, third quarter revenues, etc., Layton remained an above average performer in all categories, and Dolan continued to be a substantially below average performer in all categories. ____, ___.

59. All DIMA Portfolio Managers had had significant lost fees as the result of client terminations in 2002. _____, ____.

60. Even assuming the accuracy of DIMA's figures, at least seven Portfolio Managers had larger losses as a percentage of annual revenue than Layton had had. ____, ___.

61. At the time of his termination on November 19, 2002, Layton remained, along with Moses, the top-performing Portfolio Managers in the DIMA Boston office. ____, __.

62. Although DIMA purports to justify the substitution of Dolan for Layton on the termination list on the basis that IMC determined that DIMA needed to look at a higher level of Portfolio Manager (Directors and Managing Directors) because of failure to have met the dollar mandate, the November 12, 2002, e-mail actually identifies only two Managing Directors to be on the termination list: Layton and Bliss.

63. As Bliss was never terminated, Layton was apparently the only DIMA Managing Director who was terminated. See DIMA doc. 05113-116.

64. Layton (age __), Bliss (age __) and Buckley (age __) were all substantially over 40 years old. ____, __.

65. After determining who were to be terminated on November 19, 2002, Maloney sent "scripts" to the Managers/HRD representatives as to what they should say to the terminees. _____, __.

66. For Layton, Maloney's script tied Layton's termination to "excess capacity in Boston," even though Layton had dual functions at the DIMA Boston office.

67. On November 19, 2002, shortly after Layton arrived at the DIMA office, he encountered his long-term friend and colleague Saltonstall who directed Layton to "report to HR." Layton dep., 79..

68. Saltonstall at this time told Layton that he was being terminated immediately, and that David Denaro ("Denaro"), an HR representative in Boston, would be explaining the proposed severance package he would be offered. _____.

69. Layton asked Saltonstall why he was being terminated, and Saltonstall told him that he was not considered a "team player." Layton dep., 80-82.

70. Layton found this explanation to be incredible, particularly since Saltonstall had encouraged Layton to take on the responsibility of a Co-Chair of the ESG ____, __.

71. As of November 19, 2002, Layton also knew that after LMCG had withdrawn the group offer to Moses, Layton and Duke, Saltonstall himself had sought an employment opportunity with LMCG. _____, __.

72. In this November 19 meeting with Layton, Saltonstall also referred to "restructuring" and "downsizing" as explanations for Layton's termination. Layton dep., ____.

73. Layton did not believe this to be a credible reason because his Portfolio Manger and ESG responsibilities continued to be performed by other persons, specifically Dolan and Fitzpatrick. Layton dep., _____.

74. After this meeting with Saltonstall, Layton was then presented with a proposed letter agreement, dated November 19, 2002, Rubin affidavit, Exhibit __. (the "letter agreement").

75. The letter agreement provided no payment for any portion of Layton's bonus for 2002, even though Layton would have been employed for 11 of the 12 months of 2002, and had made substantial financial contributions during that year. _____, ___.

76. The letter agreement further conditioned the payment of severance payment of $244,000 upon the execution by Layton of a release of his age discrimination claims. Layton dep., 96.

77. Appendix A to the letter agreement referred to nine positions that were being eliminated, including two at the Managing Director level. _____

78. Layton believes that there was in fact only one Managing Director being eliminated on November 19, 2002. _____ ____, __.

79. Layton quickly determined that the list was "not in accord with what was happening on the ground" because he had seen numerous people in Boston being fired for unknown reasons, and knew from attendance at "see you later" lunches and from the handing out of money to "people whose jobs were taken away and who had sick spouses or what not", _____, and that Appendix A was wildly inaccurate, _____, in that it substantially understated the number of employees terminated at DIMA since the Deutsche Bank acquisition of Scudder in April 2002 (Layton dep. ____94), almost all of whom Layton knew to be substantially over 40 years of age. _____.

80. Layton also doubted the veracity of Appendix A because it described the appropriate decisional unit as the "Investment Advisory" unit, a term never used to describe any group at Scudder or DIMA, which had ever employed him. Layton dep., 129.

81. Although Layton was paid through November 29, 2003, he was asked to depart immediately after the meeting with Denaro for a meeting with an outplacement representative retained by DIMA.

82. After his termination, Layton sent out a series of letters to as many of his clients whose names and addresses he could recall, to advise them that he was no longer at DIMA, and that he had not just disappeared off the face of the earth. Layton dep., 117.

83. In these letters, Layton did not seek to solicit his former clients' future business, especially as he had no other employer to whom to send the business. Layton dep., ___.

84. Although DIMA contends that a number of individuals assumed responsibilities for those of Layton's accounts that remained at DIMA after Layton's termination (a majority of accounts after Layton's termination left DIMA to go elsewhere), and that these individuals were both older and younger than Layton, _____, ____ Layton, as a Portfolio Manager, was substituted for Dolan on the termination list.

85. As to his ESG duties, Layton was replaced by Fitzpatrick who, at age ___, also was substantially younger than Layton, and who had had significant performance issues, which had brought him to the attention of the IMC as a candidate for termination. ____, ___.

86. In late December, 2002, when Layton telephoned Denaro to ask for an extension of the 45-day period for consideration of the proposed letter agreement and release, Denaro told Layton that DIMA had decided not to give Layton the payment referred to in the letter agreement because he said that Layton had contacted his former clients after November 19, 2002, in contravention of what the document indicated. Layton dep., 101.

87. Because Layton knew that he had not solicited any of his former clients for business prior to late December, and because in April 2002, he had specifically opted out in writing of the Deutsche Bank Code of Ethics provisions respecting non-solicitation of clients and employees post-termination (at the specific direction of Nelund) and had

13

advised DIMA representatives of his decision to do that in May, 2002, _____, \_\_\_, Layton decided to sign the letter agreement after crossing out the two paragraphs that would have prevented such solicitation for a substantial period after his termination, as he had at the time no alternative source of income, returning the revised letter agreement to Denaro in the hope that the signed and modified agreement would convince DIMA to pay him the $244,000 in a exchange for a release of all legal claims, while allowing him to pursue alternative employment in the private wealth management business.  \_\_\_\_\_, \_\_\_\_.

88.   No such payment was ever made to Layton by DIMA. \_\_\_\_, \_\_\_.

JOHN R. LAYTON, plaintiff,

By his attorneys,

BARRON & STADFELD, P.C.

/s/ Kevin F. Moloney
Kevin F. Moloney  BBO No. 351000
100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
Tel.: 617.531.6569

and
/s/ John K. Weir
John K. Weir, admitted PHV
John K. Weir Law Offices, LLC
300 Park Avenue, Suite 1700
New York, New York 10022
Tel.: 212.572.6374

Dated: February 16, 2002

Certificate of Service.

This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF); and to co-

counsel for plaintiff, John K. Weir, via e-mail.

                                                                        /s/ Kevin F. Moloney

Dated: February 16, 2006

[348480.1]