UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| John R. Layton,<br><br>       Plaintiff,<br><br>v.<br><br>Deutsche Investment Management<br>Americas, Inc.,<br><br>       Defendant. | BBO No. 351000<br><br>Response Memorandum of Plaintiff<br>Layton to Defendant's Reply to<br>Layton's Opposition to Defendant's<br>Motion for Summary Judgment. |

      Plaintiff John R. Layton ("Layton") submits this response memorandum to the reply of defendant Deutsche Investment Management Americas, Inc. ("DIMA") (the "DIMA reply") to Layton's opposition ("Opposition") to DIMA's motion for summary judgment.  This response is necessary because DIMA's Reply misstates or omits important facts, and urges an incorrect application of the law.  The matters set forth in this response will aid the court in its determination of the issues raised by DIMA's motion for summary judgment.

      1.     Facts.

      Layton relies on the facts set forth in his Opposition , in his Counter Statement of Relevant Facts, and on the following additional facts concerning the course of discovery in this case.

      The record of the prior proceedings in this matter, which is missing from DIMA's motion papers, demonstrates very clearly that, despite the obstacles which Layton encountered due to DIMA's course of conduct in failing to make discovery in a timely, forthright and complete manner, which DIMA continued in late 2004 and 2005, Layton has proceeded diligently and in good faith to obtain the discovery from DIMA that he needs to prepare for trial.  Affidavit of John K. Weir (the "Weir affidavit"), filed herewith, at ¶3.  It also shows that, due to DIMA's failure to make discovery, Layton has not been able to obtain the discovery he needs on DIMA documents and from DIMA related

witnesses for purposes of defending against the DIMA motion for summary judgment, amending the complaint to assert a <u>Smith</u> v. <u>City of Jacksonville</u>,[1] disparate impact claim, and preparing properly for trial. Weir affidavit, ¶3.

For example, DIMA's initial disclosures, served July 7, 2004, failed to include the name and title of one Pierre DeWeck ("DeWeck"), who, Layton did not discover until June 2005 during the depositions of DIMA's G. West Saltonstall ("Saltonstall") and his superior at DIMA, Gloria Nelund ("Nelund"), was a very senior DIMA official located in Frankfurt, Germany, who had played a very significant role in the downsizing of DIMA after the merger in April 2002. Weir affidavit, ¶¶ 6-7, 27.

DIMA's continued failure and refusal to adequately and forthrightly answer interrogatories and produce relevant documents, and DIMA's repeated late production of documents, also seriously impeded Layton's discovery efforts. The parties' joint motion to extend discovery, filed November 19, 2004, indicated that Layton, "<u>intends to depose eight individuals once DIMA has produced documents responsive to [Layton's] document requests</u>...." (Emphasis added.) Weir affidavit, ¶12. On December 12, 2004, DIMA responded to Layton's October 12 request for production, but many of the requested documents were not produced or were produced in highly redacted form on DIMA's claim that there was no confidentiality order in place. Weir affidavit, ¶13. In January 2005, the parties concluded negotiations of the terms of a protective order concerning confidentiality with the result that, on January 26, 2005, the parties filed, and on February 3, 2005, the court allowed, the agreed upon protective order. Weir affidavit, ¶14. On February 14, 2005, DIMA produced additional documents but many of them were still redacted, even though the protective order had been allowed on February 3, 2005. Weir affidavit, ¶16.

On March 29, 2005, DIMA informed Layton's counsel that it had additional documents to produce, and was suggesting that Layton's depositions of Saltonstall and David Denaro ("Denaro"), scheduled for March 30 and March 31, respectively, be delayed until after DIMA produced the

---

[1] 544 U.S. 228 (March 30, 2005).

2

additional documents. Weir affidavit, ¶18. Weir agreed, but insisted that the additional documents be produced by April 4, 2005. Weir affidavit, ¶19. On April 6, 2005, because DIMA had not produced the promised additional documents, Layton filed a motion to compel production of the documents requested in his October 12, 2004, request for production. Weir affidavit, ¶21. On April 20, 2005, DIMA filed an opposition to the Layton motion to compel production, stating, among other things, that DIMA was "in the process of producing" what DIMA referred to as "a significant number" of what it claimed were "recently discovered additional documents." Weir affidavit, ¶22. This resulted, on May 2, 2005, in the court entering an order denying, without prejudice, Layton's motion to compel production. The docket states, "Motion denied at this time. So ordered." ¶23. Thereupon, Layton's counsel reviewed the additional documents produced by DIMA and then re-scheduled the depositions of Saltonstall and Denaro to take place on May 31 and June 1, 2005, respectively, in Boston. Weir affidavit, ¶24.

    Because the United States Supreme court had on March 30, 2005, decided in <u>Smith</u> v. <u>City of Jacksonville</u>, 544 U.S. 228 (2005), that age discrimination claims may be based upon disparate impact, Layton's counsel also began initial efforts to retain an expert to testify on disparate impact issues in this case. Weir affidavit, ¶24.

    On June 1 and 2, 2005, in Boston, Layton's counsel took the depositions of DIMA witnesses Denaro and Saltonstall. Weir affidavit, ¶25. Weir scheduled Layton depositions of other DIMA witnesses Nelund, to whom Saltonstall reported, Kurt Miscinski, ("Miscinski") and Leo Grohowski ("Grohowski") to take place in New York (where the deponents worked for DIMA) on June 14 (Nelund) and June 15 (Miscinski and Grohowski). Weir affidavit, ¶28. However, on June 13, 2005, at about 5:30 p.m., the evening before the start the Nelund deposition, DIMA counsel delivered a package of additional DIMA documents identified by DIMA counsel as a "supplemental production." Weir affidavit, ¶29.

    The "supplemental production" was a file of documents that Nelund testified in deposition the next morning that she had maintained and kept concerning the 2002 downsizing at DIMA. Weir

3

affidavit, ¶30.  In this file, Weir discovered a memorandum from one Leonard Dolan to Saltonstall (the "Dolan memorandum"), which Saltonstall had forwarded to Nelund, in which Dolan stressed his young age as a reason for him not to be terminated in the downsizing at DIMA.   Weir affidavit, ¶31.

Nelund also testified that she had never seen Layton's complaint in this case and that, because she had never been contacted concerning Layton's October 12, 2004, document request, she had never made a search for the documents identified in Layton's request for documents.  Weir affidavit, ¶34. Although in an August 8, 2005, errata sheet (a copy of which is annexed to the Weir affidavit as Exhibit "B"), Nelund backtracked somewhat from her June 14, 2005, deposition testimony, Nelund's errata sheet statement does not contradict her testimony that she had not seen or been apprised of the content of Layton's October 12, 2004, document request and had not searched her files for her 2002 DIMA downsizing file until she was about to be deposed on June 14, 2005.  Weir affidavit, ¶35-36.

On June 20, 2005, Layton served a second request for production of documents and a first set of interrogatories.  Weir affidavit, ¶37.  In the week of July 21, 2005, Weir had a discussion with DIMA counsel in which Weir indicated that he planned on taking the deposition of the head of DIMA's Human Resources Department, one James Maloney ("Maloney") and probably the deposition of other DIMA related persons; but emphasized that he did not intend to take those depositions before DIMA made complete and responsive document production and served complete and responsive interrogatory answers.  Weir affidavit, ¶40.  On July 27, 2005, DIMA served a response, including objections, to Layton's June 20, 2005, second document request and objections and answers to the June 20, 2005, Layton interrogatories.  Weir affidavit, ¶44.  Because both discovery responses asserted various objections, and were highly non-responsive and unhelpful, the responses were highly unsatisfactory and they caused Weir to reaffirm his decision not to take the Maloney deposition and those of other DIMA related persons until he received the requested documents and the answers to the interrogatories. Weir affidavit, ¶45.

During the week of August 1, 2005, Attorney Rubin told Weir that DIMA was offering to settle this case and requested a response from Layton. Weir affidavit, ¶50. Weir tried to reach Layton before departing for a previously planned two week vacation out of the country, but was unable to make contact with Layton before leaving. Weir affidavit, ¶51. When, in the week of August 22, 2005, Weir returned from vacation, he was able to discuss settlement with Layton and telephoned Attorney Rubin to advise him of Layton's response to the DIMA's settlement proposal, and to request a meeting in Boston on August 29, 2005. However, Weir was unable to talk to Rubin as he was advised that Attorney Rubin was "out" this week and would be "out" the following week. Weir affidavit, ¶52.

Because DIMA had initiated settlement negotiations, Layton and Weir decided that settlement should be explored fully before the cost, time and expense of motion practice and additional depositions were to be incurred. Weir affidavit, ¶53. Thus, in the September to October period, Weir spoke with DIMA counsel who reacted negatively to the Layton settlement demand, but asked for details as to the aggregate amounts of attorneys' fees incurred and at the same time disclosed that he (Attorney Rubin) had not initially extended the full limit of his authorization to settle. Weir affidavit, ¶54. He requested that Layton reduce his settlement demand before DIMA would consider an increase in its offer. Id. When Weir later reported to DIMA that Layton did not wish to reduce his settlement demand, Attorney Rubin inquired if Layton would agree to mediation utilizing the JAMS office in Boston. Weir affidavit, ¶55.

On November 10, 11, 14 and 17, Weir negotiated with DIMA counsel the terms of a reference of the matter to mediation at JAMS and the terms of a joint motion to the court to stay discovery in order to proceed to mediation. Weir affidavit, ¶56. When, in these negotiations, DIMA counsel insisted on including in the motion to stay and refer to mediation January 17, 2006, as the date for the filing of a motion for summary judgment, Weir insisted that the court be advised in the motion of Layton's intent to file motions to compel discovery and for further discovery if the JAMS mediation did not resolve the case. Weir affidavit, ¶57.

5

The parties' "Joint Motion for Referral to Non-binding Mediation" was filed on November 18, 2005. Weir affidavit, ¶58. As allowed by the court on November 22, 2005, the Joint Motion recognized that if mediation did not result in resolving the case, at least one of the parties intended to bring on before the court motions to compel discovery and to enlarge the time for completing discovery, by stating,

> 3. During the mediation process, <u>all proceedings... shall be stayed</u>.
>
> 4. <u>Neither party will be prejudiced by agreeing to mediate.</u> Specifically, <u>both parties reserve any rights or arguments they have as of this date, including any rights or arguments to raise or oppose motions to compel or modify time limits</u>.
>
> 5. The deadline for filing dispositive motions...shall be re-scheduled to January 17, 20006. <u>This deadline, as well as subsequent scheduled events, may be subject to further re-scheduling depending upon the results of any motions contemplated in paragraph 4, above</u>.

(Emphasis added.) Weir affidavit, ¶59.

On December 12, 2005, mediation went forward before JAMS in Boston, but was unsuccessful. Weir affidavit, ¶60. The mediator suggested a further session, but DIMA counsel indicated that he wished to confer with DIMA and that thereafter, he would contact Weir as to how to proceed. <u>Id</u>. He did not do so. <u>Id</u>.

On January 17, 2006, DIMA filed a motion for summary judgment. Weir affidavit, ¶61. On February 16, Layton timely filed his opposition to the DIMA motion for summary judgment, contending, among other things, that he should be allowed relief under Fed. R. Civ. P. 56(f). <u>Id</u>.

2. <u>Argument</u>.

2.1 <u>The evidence of discrimination in this case is more than sufficient to raise genuine issues of material fact precluding summary judgment on Count I, alleging age discrimination</u>.

Notably, DIMA does not contest any of the law cited by Layton in support of his ADEA claims. DIMA's Reply asserts only that Layton has not marshaled sufficient facts to avoid summary judgment.

In the DIMA reply (pp. 4-6), DIMA contends that summary judgment is proper on Count I, which alleged age discrimination, because Layton has not produced sufficient evidence of

6

discriminatory animus. To make this argument, DIMA completely ignores one important document evidencing its discriminatory intent (the October 21, 2002, version of the DIMA termination list which included the "age as of 12/31/02" of each of the proposed terminees), and improperly seeks to avoid inferences which flow logically from another (the Dolan memorandum in which Layton's co-employee, Leonard Dolan, stressed his young age, and which Layton's superior, Saltonstall, a decision maker, forwarded to his superior Nelund, another decision maker, who then kept the Dolan memorandum in her office file concerning the 2002 downsizing at DIMA. As set forth in Layton's memorandum in opposition to the motion for summary judgment (§§2.2.1-2.2.2), these documents either provide direct evidence of discrimination under the <u>Price Waterhouse</u> "mixed motive" analysis, or circumstantial evidence warranting an inference of discriminatory intent under the <u>McDonnell Douglas</u> three stage "pretext" analysis.

      The termination list is strong evidence of discrimination because there is no dispute that the list was relied upon by the DIMA Investment Management Committee ("IMC") in making its decisions to terminate Layton and others, yet there is no legitimate business reason why the list would include the ages of potential terminees. Additionally, there is no reason stated in the DIMA reply as to why the information on the ages of potential terminees disappeared from later lists.

      The Dolan memorandum also provides strong evidence of DIMA's discriminatory motivation. Although written by Dolan, a non-decision maker, it was forwarded by Dolan to Saltonstall who was a decisions maker, and who, in turn, forwarded it to Nelund, another decision maker, who then kept the memorandum in her DIMA 2002 downsizing file. . Saltonstall's act of forwarding the memorandum and Nelund's act of keeping it in her file after the decisions had been made, the failure of either one of them to disavow the ageist comments within the memorandum, and the fact that Dolan's name was removed from the list and Layton's name substituted for him, all indicate that DIMA's decision makers adopted, or at the very least were influenced by the Dolan memorandum.

In addition to the termination list and the Dolan memorandum, other evidence supports an inference of DIMA's discriminatory intent. In his opposition memorandum, Layton cited the fact that Dolan's name disappeared from the list of terminees between October 21, 2002, and October 27, 2002, while Layton's name was added during that period; Dolan's relative youth as compared to Layton's being substantially older; Dolan's inferior job performance record as compared to Layton's, the falsity of DIMA's stated reasons for selecting Layton for termination over other inferior performers; and the other numerous other genuine issues of material fact identified in Layton's Opposition. Layton's Opposition also cited DIMA's shifting rationales for the termination, the flaws in DIMA's proffered non-discriminatory reasons for the termination, and DIMA's efforts to conceal the firing of ADEA protected employees as evidence of discriminatory motivation. All of this evidence, both direct and circumstantial, is more than sufficient to raise genuine issues of material fact precluding summary judgment on the ADEA claim.

The court should reject DIMA's invitation to ignore Layton's evidence. DIMA first asserts that the Dolan memorandum does not support an inference of discriminatory intent. Specifically, DIMA claims that there is no evidence as to when the memorandum was written, when Dolan gave it to Saltonstall, or whether Dolan knew his name was on the termination list when he did so. In so arguing, DIMA ignores the standard applicable to summary judgment, which dictates that all reasonable inferences are to be drawn in favor of the non-moving party. LeBlanc v. Great American Insurance Company, 6 F.3d 836, 841 (1st Cir. 1993). Here, it is reasonable to draw the inference that Dolan would not have written the Dolan memorandum had he not been aware that his name was on the termination list, or at least that he was at great risk in the termination process. Whether he knew for a fact that his name was on the October 21, 2002, DIMA termination list is not relevant. It also is reasonable to infer that the decision-making process for the terminations was ongoing when Saltonstall forwarded the Dolan memorandum to Nelund. Why else would he have done so? Moreover, the fact that Nelund kept the Dolan memorandum in her file for the 2002 downsizing at DIMA justifies the inference that the

8

memorandum related to an ongoing process, and that she regarded the Dolan memorandum as a serious document, worthy of keeping in her file. Finally, the timing of the Dolan memorandum supports the inference that it influenced DIMA's decision-making process. Dolan's name, but not Layton's, was originally on the list. Yet, after the Dolan memorandum was circulated, Layton's name replaced Dolan's, with no intervening meeting of the IMC, and no evidence of any intervening change in either employee's performance. These are all reasonable inferences which the court should draw in favor of Layton on this motion for summary judgment.

DIMA also claims that Layton's discrimination claim is undercut by the fact that DIMA did not fire either Saltonstall or Moses, both of whom were older than Layton. There is no merit to this contention. The retention of Saltonstall is hardly surprising, given that he was the head of the committee deciding whom to fire. Deciding to fire himself would have required an extraordinary level of dedication and selflessness on Saltonstall's part. Nor is the retention of Moses meaningful in the way DIMA asserts. That DIMA retained a person older than Layton proves nothing. The issue in this case is whether DIMA terminated Layton due to his age. It is not necessary that Layton prove that DIMA fired every last person his age or older. The retention of Moses is relevant in another way, however. One of DIMA's proffered explanations for terminating Layton was that he was not considered a team player (presumably because he had investigated employment elsewhere during the DIMA restructuring). However, both Saltonstall and Moses had also investigated other employment. Layton's Corrected Counter Statement of Relevant Facts, ¶¶69-71.

Finally, DIMA asserts that Layton has produced no evidence supporting his claims that DIMA had a plan, after the merger with Scudder, to eliminate the positions held by older Scudder workers, that DIMA terminated other employees in connection with the November 19, 2002 reduction in force or that DIMA concealed from Layton the names of other terminated employees by failing to include them on the OWBPA list given to him. In fact, Layton has provided evidence to support each of these facts. As evidence that other employees were terminated, and that the OWBPA list given to Layton was

9

inaccurate, Layton submitted the Affidavit of David O'Hara. By a separate motion, DIMA seeks to strike that affidavit. However, for the reasons set forth in Layton's opposition to that motion to strike, the O'Hara affidavit is admissible and supports these facts. Layton also provided admissible evidence that DIMA had a master plan to eliminate the position of older Scudder worker. Even if the court finds Layton's evidence of the DIMA master plan insufficient, it should be noted that such evidence is exactly what Layton sought via his First and Second Requests for Production of Document served on October 12, 2004, and June 20, 2005, respectively, and the interrogatories he served on June 20, 2005, but to none of which has DIMA ever responded or answered fully or satisfactorily. That is precisely some of the information which Layton expects to obtain through the further discovery sought pursuant to Rule 56(f).

    2.2    <u>Layton is entitled to further discovery pursuant to Rule 56(f)</u>.

In his Opposition, Layton argued that, if the court did not deny DIMA's motion for summary judgment outright, it should afford Layton an opportunity to conduct additional discovery pursuant to rule 56(f). Layton pointed out that a court should liberally apply Rule 56 where the interests of justice would be served[2], and Rule 56(f) motions should be granted routinely where the party moving for summary judgment has sole possession of the facts needed to oppose the motion.[3]

In its Reply, DIMA claims that Layton is not entitled to Rule 56(f) relief because he failed to diligently pursue discovery prior to the motion for summary judgment. DIMA also appears to rely on its assertion that Layton failed to make the court aware prior to the motion for summary judgment of his inability to obtain the discovery he sought. This might be a good argument were it not so utterly divorced from reality.

---

[2] Patterson-Leitch Co. v. Massachusetts Municipal Whole Sale Electric Co., 840 F.2d 985, 989 (1st Cir. 1988); Hebert v. Wicklund, 744 F.2d 218, 222 (1st Cir. 1984).

[3] Hebert, 744 F.2d 222 n.4, citing Ward v. United States, 471 F.2d 667, 670 (3rd. Cir. 1973); Concord Laboratories, Inc. v Concord Medical Center, 552 F.Supp. 549, 554 (N.D. Ill. 1982). See also, International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1267 (5th Cir. 1991); Strahm v. WSI Corporation, 1993 WL 540566, *6 (D. Mass. May 14, 1993); C-B Kenworth, Inc. v. General Motors Corporation, 118 F.R.D. 14, 16-17 (D. Me. 1987) ("continuances under Rule 56(f) are particularly appropriate where the cause of action is complex, and where the facts essential to the opposing party's affidavit are within the other party's exclusive control.").

As set forth in the factual section of this memorandum, Layton vigorously pursued discovery but was repeatedly thwarted by DIMA's failure to adequately respond to interrogatories and requests for production of documents. DIMA withheld or redacted many documents responsive to Layton's first request for production of documents, even after the parties had entered a confidentiality agreement. In March, 2005, just before Layton was to depose Saltonstall and Denaro on March 30 and 31, DIMA belatedly informed Weir that it would produce additional documents, causing a delay in the depositions. However DIMA failed timely to produce the promised documents, and Layton had to file a motion to compel production. Only then did DIMA produce additional documents. After reviewing the additional documents, Layton's counsel took the depositions of DIMA's Saltonstall and David Denaro.

Thereafter, Weir noticed the depositions of Nelund, Grohowski, and Miscinski. However at 5:30 p.m. on the night before the Nelund deposition, DIMA announced that it was belatedly producing yet more documents, this time from a file maintained by Nelund. These documents included the Dolan memorandum. DIMA has not denied that Nelund was never shown Layton's first request for production of documents, which should have caused DIMA to produce the Dolan memorandum and other documents months earlier.

On June 20, 2005, Layton served a second request for production of documents and first set of interrogatories. While Weir intended to depose DIMA's James Maloney, the head of DIMA's Human Resources Department and other DIMA related witnesses, he emphasized to DIMA counsel that he did not intend to take those depositions before DIMA made complete and responsive document production and served complete and responsive interrogatory answers. Because DIMA's July 2005 responses to the second request for production and first set of interrogatories were highly non-responsive and unhelpful, they caused Weir to reaffirm his decision not to take the Maloney deposition or those of other DIMA related persons until after he had received the requested documents and the answers to the interrogatories.

In August 2005, at the suggestion of DIMA counsel, the parties' focus shifted to possible settlement and mediation. When the parties filed a joint motion to stay discovery and refer to mediation in January 2006, Weir insisted that it contain a notice to the court that Layton intended to file motions to compel and for further discovery, thereby notifying the court of Layton's difficulty in obtaining discovery and that Layton believed additional discovery was necessary.

In addition to its failure to respond appropriately to Layton's requests for production and interrogatories, thereby delaying and obstructing Layton's efforts to depose witnesses, DIMA also failed to disclose the role played by DeWeck, a very senior DIMA official, in the downsizing of DIMA and therefore in Layton's termination. Information about DeWeck came out only in response to questioning by Layton's counsel in the Saltonstall and Nelund depositions in June 2005.

DIMA relies on three cases in support of its claim that Layton failed to diligently pursue discovery and therefore is undeserving of relief under rule 56(f). Paterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988); Ayala-Gerena v. Bristol Meyers-Squibb Co., 95 F.3d 86 (1st Cir. 1996); Massachusetts School of Law at Andover, Inc. v. ABA, 142 F.3d 26 (1st Cir. 1998). None of those cases bears even a passing resemblance to the facts of the present case. In those cases, the parties seeking rule 56(f) relief were guilty of egregious failure to pursue discovery. For example, in Paterson-Leitch, the court denied a Rule 56(f) motion because the plaintiff: (1) had not diligently pursued discovery prior to the filing of the motion for summary judgment; (2) did not file a 56(f) motion until after the magistrate had already ruled on the merits of the motion for summary judgment; and (3) when finally made, the motion was "woefully deficient." The Paterson-Leitch court recognized that rule 56(f) should generally be applied liberally, stated:

> Once it is recognized that Palco did not muster a Rule 56(f) campaign in any meaningful way until *after* the magistrate had ruled, then the futility of its effort becomes apparent. Pretrial discovery was unrestricted to the date of entry of the scheduling order (July 24, 1985), but Palco did nothing to take advantage. Then, it acquiesced in the order staying discovery. We count this nonchalance heavily against the plaintiff.

12

> \*\*\*
>
> Here, Palco's conduct exemplified a lack of diligence totally at odds with the spirit, as well as the letter, of Rule 56(f). Appellant had a brief (but sufficient) opportunity to conduct discovery. It acquiesced in the order staying further discovery. It did not seek to reopen discovery as the hearing before the magistrate approached. In advance of that hearing, it neglected to file a Rule 56(f) affidavit or any substantially equivalent documentation. Even after the magistrate had ruled, appellant's affidavit, in addition to being untimely, was woefully deficient. It nowhere set out any reasonable basis for Palco's professed belief that discoverable material facts existed which would thwart the defendants' motions. It was wholly bare of anything which smacked of "good cause" to explain the long delay. It failed entirely to meet the criteria which we think Rule 56(f) embodies.

840 F.2d at 989-90. (Emphasis in the original text.) In like manner, in Ayala-Gerena, a Rule 56(f) motion was denied where the plaintiffs: (1) filed their original oppositions to the motions for summary judgment without previously having informed the trial "court of their inability to properly oppose summary judgment due to incomplete discovery" and "never sought an additional extension of the discovery deadline before filing their opposition." 95 F.3d at 86. In addition, the opposition itself was failed to refer to any inability to oppose based on lack of discovery. Plaintiff's first informed the court about outstanding discovery after filing not only their opposition but their supplemental opposition. Id.; (2) Plaintiffs failed to exercise due diligence prior to the motion for summary judgment. While discovery concluded 1/3/94, Plaintiff's failed to serve a request for production of documents until 11/12/94, after getting one extension and near the end of that extended period. Id. at 92-93; and (3) Plaintiffs violated Puerto Rico Local Rule 311.11 requiring the parties to meet to discuss objections to the document request. Id. Finally, in Massachusetts School of Law, a Rule 56(f) motion was denied where: (1) the 56(f) motion was filed after party had opposed motion for summary judgment on the merits and three weeks after oral argument;(2) the information which plaintiff claimed would be obtained through additional discovery was not relevant to the dispositive res judicata issue and (3) the plaintiff had failed to

13

<u>make the Rule 26 initial automatic disclosures</u> and had <u>made no attempt to initiate any discovery</u>, <u>nor filed any motions to compel</u>.  <u>Id</u>.

In contrast to the cases cited by DIMA, Layton vigorously pursued discovery throughout this case despite DIMA's lack of cooperation.  He complied with all applicable court rules, and put DIMA on notice, and through the "Joint Motion for Referral to Non-binding Mediation," advised the court as well that necessary discovery had yet to be taken, all well prior to the filing of DIMA's motion for summary judgment.  Layton filed one motion to compel (which was denied without prejudice) and has notified the court of his intent to file another.  Layton should not be penalized, as the Joint Motion for Referral to Non-binding Mediation, as allowed by the court clearly states, for proceeding to mediation.  This is particularly the case as DIMA had initiated settlement discussions and then requested Layton's agreement to go to mediation, and where the court stayed all proceedings including further pretrial discovery, in order to allow the mediation to proceed.

DIMA contends that Layton was not diligent because he failed to depose Saltonstall a second time after DIMA's late production of the Dolan memorandum, and because he did not depose DeWeck after discovering his existence in the Saltonstall deposition.  However, Layton does not base his request for Rule 56(f) relief on a need to depose Saltonstall again.  With regard to DeWeck, Layton's position throughout this litigation, which was communicated repeatedly to DIMA, was that he would not depose current or former DIMA employees like DeWeck until DIMA had fully and adequately responded to Layton's requests for production for documents and interrogatories.  As of July 27, 2005, DIMA had served only objection-laden, incomplete and non-responsive responses to Layton's discovery requests.

DIMA also claims that Rule 56(f) relief should not be granted with respect to Layton's disparate impact claim because:  (1) Layton never amended that claim into his complaint; (2) was not diligent in that he cancelled the deposition of Maloney; and, (3) the Supreme Court decided <u>Smith</u> v. <u>City of Jackson</u>, 125 S.Ct. 1536 (2005), confirming the availability of a disparate impact ADEA claim, well before the discovery deadline in this case.  That is wrong.  First, Layton has not yet amended his

14

complaint because he has not yet been able to obtain via discovery from DIMA the facts which would support a disparate impact claim. DIMA appears to be arguing that because the disparate impact claim is not yet specifically set forth in the complaint in the case, Layton cannot obtain discovery concerning it, and therefore cannot base a Rule 56(f) request on such discovery. That is not correct. While Rule 26 initially limits discovery to "any matter, not privileged, that is relevant to the claim or defense of any party," Layton has the right to petition the court to allow, for good cause, discovery as to "any matter relevant to the subject matter involved in the action." Clearly, the disparate impact claim is relevant to the subject matter of this case.

Second, Layton's counsel did not cancel the deposition of Maloney. Weir Affidavit, ¶¶41-42, 46-49. It was never noticed because Layton's counsel wanted an adequate response by DIMA to Layton's discovery requests prior to deposing Maloney and other DIMA related witnesses. Due to DIMA's unwarranted actions to impede orderly discovery, the Maloney deposition has not yet been taken.

Third, although <u>Smith</u> was decided on March 30, 2005, Layton could not amend his complaint without first obtaining via discovery the facts necessary to support a disparate impact claim. <u>See</u> Fed. R. Civ. P. 11. Layton made prompt and diligent efforts to obtain that information. <u>See</u>, for example, Layton's June 20, 2005, second request for production of documents and first set of interrogatories, which sought information concerning 25 DIMA employees who had been terminated by DIMA, for the very purpose of obtaining evidence for a disparate impact claim. DIMA refused to give meaningful responses to these discovery requests. Layton notified the court, in the motion to refer to mediation, that he intended to file a motion to compel. He had not filed such a motion earlier in the fall of 2005 because the focus of the case had shifted, at DIMA's suggestion, to settlement and mediation, and all pretrial proceedings, including discovery and motion practice, were stayed.

Finally, DIMA claims that Layton's Rule 56(f) request was "procedurally defective" in that it was not supported by affidavit or in any other authoritative manner. Layton has submitted an affidavit

15

herewith. There is no merit to DIMA's claim that a Rule 56(f) request must be submitted as a separate motion.

For all these reasons, if the court does not deny the motion for summary judgment on the basis of the numerous genuine issues of material fact in the record to date, it nevertheless should defer ruling on the motion and grant Layton relief under Rule 56(f).

> 2.3 <u>The court should allow Layton to amend his claims for breach of the covenant of good faith and fair dealing (Count II), breach of contract (Count III), and negligent/fraudulent misrepresentation (Count IV), as set forth in the motion to amend filed herewith</u>.

Layton withdraws his claims for breach of the covenant of good faith and fair dealing (Count II), breach of contract (Count III), and negligent/fraudulent misrepresentation (Count IV), insofar as they are premised upon DIMA's failure to abide by the severance agreement it offered to Layton. However, the court should allow Layton to amend these claims so as to rely on DIMA's failure to pay Layton the bonus he had earned, and DIMA's promises to Layton to induce him at the time of the April 2002 merger and in the months immediately thereafter, to continue in the employ of DIMA and not pursue employment elsewhere. If proven at trial, these facts could support an implied agreement not to fire Layton in layoffs related to the Scudder merger, and DIMA's violation of that agreement, as set forth in Layton's memorandum in opposition to the summary judgment motion, and in the accompanying motion to amend.

Moreover, because the statute of limitations for these contract claims has not yet run, if this court were to deny the requested amendment, Layton could file a separate action asserting the identical claims. It also would save both the parties and the court time and money if Layton were simply allowed to amend his complaint.

The court should reject the assertion in the DIMA Reply (p. 8) that, even if DIMA impliedly agreed that DIMA would not terminate Layton during reductions in force subsequent to the Scudder merger, Layton's termination did not violate that agreement because the November 19, 2002, RIF was "distinct from earlier layoffs in that this RIF was not mandated until September 2002--- after

16

Grohowski's alleged promise to Plaintiff." This objection, which appears to relate only to the fraud claim, misses the point. Even if DIMA did not commence the particular round of layoffs, which included Layton, until after Grohowski's promise, that is irrelevant. The promise, express or implied, was that Layton would have special protection from any future merger related layoffs. At the time Grohowski spoke, he may not have known for a fact that Layton would be fired, but he did know that DIMA, despite his promises, would not be affording Layton any special protection from whatever layoff decision it might make in the immediate future.

Second, contrary to DIMA's assertion, the layoffs were an ongoing process after the April 2002 merger. Although the first persons terminated allegedly were personnel in duplicative positions, DIMA soon moved on to terminations of other older upper- level former Scudder employees like Layton. The O'Hara affidavit and Layton's deposition testimony, Layton dep. pp. 64-65, 155, provide evidence of this pattern. In addition, evidence as to the continuous nature of the layoffs, DIMA's master plan, and who was terminated and when, was sought by Layton in his June 20, 2005, second request for production of documents and a first set of interrogatories, which DIMA has never fully or adequately answered. Additional discovery under rule 56(f) should be allowed if the court deems Layton's evidence on this point insufficient.

    3.    <u>Conclusion</u>.

For all of the foregoing reasons, and for the reasons set forth in Layton's Opposition and his memorandum in support thereof, the court should deny DIMA's motion for summary judgment or, if the motion is not denied, should defer ruling on the motion pursuant to Fed. R. Civ. P. 56(f) until Layton has had the opportunity to conduct additional necessary discovery.

In either event, Layton should have the opportunity to conduct necessary additional discovery. Layton represents to the court that further motion practice concerning the requests for the production of documents and the answers to interrogatories is entirely appropriate and necessary and could be filed with the court within 30 days after the instant motion for summary judgment is ruled upon. Layton

would, Depending upon the content of the further production of documents and further answers to interrogatories, would be willing to limit the additional depositions to those of James Maloney and Pierre DeWeck and would seek (with the cooperation of DIMA and DIMA counsel) to complete these depositions within 45 days after any further documents and answers to interrogatories are provided by DIMA to Layton.  Layton would then request that the court provide an additional 60 days for submissions of expert disclosures, with provision for rebuttal expert disclosures as per Rule 26.  The court then could direct that all fact and expert discovery be completed by October 1, 2006,

        JOHN R. LAYTON, plaintiff,
        By his attorneys,

        BARRON & STADFELD, P.C.

        /s/ Kevin F. Moloney
        Kevin F. Moloney     BBO No. 351000
        Roger T. Manwaring  BBO No. 548614
        100 Cambridge Street, Suite 1310
        Boston, Massachusetts 02114
        Tel.: 617.531.6569

        and
        /s/ John K. Weir
        John K. Weir, admitted PHV
        John K. Weir Law Offices, LLC
        300 Park Avenue, Suite 1700
        New York, New York 10022
        Tel.: 212.572.6374

Dated: March 21, 2006

Certificate of Service.

This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

        /s/ Kevin F. Moloney

Dated: March 21, 2006

[351598.1]