UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| * * * * * * * * * * * * * * * <br> * <br> John R. Layton, * <br> * <br>     Plaintiff, * <br> * <br> v. * <br> * <br> * <br> Deutsche Investment * <br> Management Americas, Inc., * <br> * <br>     Defendant. * <br> * <br> * * * * * * * * * * * * * * * | Civil Action No. 04-10500-EFH <br><br> BBO No. 351000 <br><br><br> Affidavit <br> of <br> John K. Weir <br><br> (Declaration pursuant <br> to 28 U.S.C. § 1746) |

1.  My name is John K. Weir.  I am a member of the bar of the State of New York and have been permitted by this court to serve as co-counsel of record, pro hac vice, for plaintiff John R. Layton ("Layton") in this action against defendant Deutsche Investment Americas, Inc. ("DIMA").  I have personal knowledge of the facts set forth herein.

2.  In its "Memorandum in Reply" to Layton's Opposition to DIMA's motion for summary judgment (the "DIMA reply memorandum"), DIMA urges the court to deny Layton's request for further discovery under Fed. R. Civ. P. 56(f)[1],

---

[1] Rule 56(f) provides as follows: "f) When Affidavits are Unavailable. Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

claiming, at pp. 1-2, that Layton has not "exercised due diligence in pursuing discovery before [DIMA's] summary judgment initiative surfaced."

3. This simply is not true. Indeed, the record of the prior proceedings in this matter, set out in detail below in ¶¶ 4 et seq., which is missing from the DIMA motion papers, demonstrates very clearly that, despite the obstacles which Layton has encountered due to DIMA's course of conduct in failing to make discovery in a timely, forthright and complete manner, which DIMA continued in both late 2004 and 2005, Layton has proceeded diligently and in good faith to obtain the discovery from DIMA that he needs to prepare for trial. As set forth in the accompanying response memorandum, Layton has demonstrated that there are genuine issues of material fact. See Layton's response memorandum, pp 6-10, 16-17. Nevertheless, Layton's inability to obtain the requested documents and answers to interrogatories due to DIMA's failures to make discovery, justifies relief under Rule 56(f). The record also shows that, due to DIMA's failure to make discovery, Layton has not been able to obtain the discovery he needs on DIMA documents and from DIMA related witnesses for purposes of defending against the DIMA motion for summary judgment, amending the complaint to

   assert a Smith v. City of Jacksonville,[2] disparate impact claim, and preparing properly for trial.

4. Layton's complaint in this matter was filed on March 11, 2004, and DIMA's answer to the complaint was filed April 7, 2004.

5. The Initial Scheduling Conference was held on June 30, 2004, with fact discovery to be completed by February 15, 2005.

6. On or about July 7, 2004, DIMA served its Initial Disclosures, a request for production of documents and a set of interrogatories.

7. Notably, DIMA's initial disclosures failed to include the name and title of one Pierre DeWeck, who, Layton did not discover until the June 2005, depositions of DIMA's G. West Saltonstall ("Saltonstall") and his superior at DIMA, Gloria Nelund ("Nelund"), was a senior Deutschebank official located in Frankfurt, Germany, who had played a very significant role in the downsizing of DIMA after the merger in April 2002. See, ¶¶ 27 and 32, supra.

8. On October 4, 2004, Layton served his Initial Disclosures, his response to the DIMA request for production and his answers to DIMA's interrogatories.

9. On October 12, 2004, Layton served his First Request for Production of Documents.

---

[2] 544 U.S. 228 (March 30, 2005).

3

10. On October 13, 2004, DIMA took Layton's deposition.

11. On or about November 11, 2004, DIMA requested Layton to agree to extend the time within which DIMA must produce the documents requested by Layton in his October 12 document request. Layton agreed.

12. On November 19, 2004, DIMA and Layton filed, and on November 23, 2004, the court allowed, their joint motion to extend discovery (including expert discovery) to March 18, 2005. That agreed upon motion, as allowed by the court, included the following statement that Layton,

> ...<u>intends to depose eight individuals once DIMA has produced documents responsive to [Layton's] document requests</u>....

(Emphasis added.)

13. On December 12, 2004, DIMA responded to Layton's October 12, 2004, request for production. However, many of the requested documents were not produced or were produced in highly redacted form on DIMA's claim that there was no confidentiality order in place.

14. In January 2005, the parties concluded negotiations of the terms of a protective order concerning confidentiality with the result that, on January 26, 2005, the parties filed, and on February 3, 2005, the court allowed, the agreed upon protective order.

15. On January 26, 2005, the parties also filed, and on February 9, 2005, the court allowed, their joint motion to extend the date for initial expert disclosures to March 7, 2005, and the date for the conclusion of discovery, including fact discovery, to May 18, 2005.

16. On February 14, 2005, DIMA produced additional documents but many of them were still redacted, even though the protective order had been allowed on February 3, 2005.

17. By letter, dated March 14, 2005, even though numerous documents had not been produced by DIMA (or were produced in highly redacted form) and the depositions referred to in ¶ 11, above, had not yet been taken by Layton, DIMA denied Layton's request to agree to extend the March 7, 2005, date for Layton's expert disclosures until after the completion of fact discovery, and instead advised Layton that DIMA would agree to extending the expert disclosure deadline until March 21, 2005, only one week beyond the date of the letter.

18. On March 29, 2005, while en route by car from my office in New York to Boston to take depositions of DIMA witnesses Saltonstall and David Denaro ("Denaro") that I had noticed for March 30 and 31, 2005, I called my office to check my voice mail messages, and learned that counsel for DIMA had additional documents to produce, and was suggesting that

     Layton's depositions of Saltonstall and Denaro be delayed until after DIMA produced the additional documents.

19. Upon my arrival in Boston later that day, I called DIMA counsel and agreed to delay the Saltonstall and Denaro depositions but I insisted that the additional documents that DIMA was promising to produce, be produced by April 4, 2005.

20. On March 30, 2005, the United States Supreme Court issued its decision in <u>Smith</u> v. <u>City of Jacksonville</u>, 544 U.S. 228 (2005), that age discrimination claims may be based upon disparate impact.

21. On April 6, 2005, because DIMA had still not produced the additional documents its counsel referred to on March 29, when DIMA requested that Layton's depositions of Saltonstall and Denaro be delayed, Layton filed a motion to compel production of the documents requested in his October 12, 2004, request for production.

22. On April 20, 2005, DIMA filed an opposition to the Layton motion to compel production, stating, among other things, that DIMA was "in the process of producing" what DIMA referred to as "a significant number" of what it claimed were "recently discovered additional documents."

23. This resulted, on May 2, 2005, in the court entering an order denying, without prejudice, Layton's motion to compel

production. The docket entry states, "Motion denied at this time. So ordered."

24. Thereupon, I reviewed the additional documents produced by DIMA, and then re-scheduled the depositions of Saltonstall and Denaro to take place on May 31 and June 1, 2005, respectively, in Boston and, given the March 30, 2005, United States Supreme Court decision in <u>Smith</u>, I began initial efforts to retain an expert to testify on disparate impact issues in this case.

25. On June 1 and 2, 2005, I took the depositions of DIMA witnesses Saltonstall and Denaro in Boston.

26. At the Denaro deposition on June 2, 2005, I requested again that DIMA produce additional documents[3] but DIMA did not do so.

27. During Day One of the Saltonstall deposition, on June 1, 2005, DIMA, through Saltonstall, identified to Layton for the first time in this case one Pierre DeWeck ("DeWeck") as a very senior official located in Frankfurt, Germany, who played a very significant role in the downsizing of DIMA.[4] According to Saltonstall, DeWeck had responsibility "for the

---

[3] See Denaro dep., pp. 38 and 85, copies of which are annexed hereto collectively as Exhibit "A."

[4] The names of "DeWeck" and "Pierre" did appear on some of the documents produced by DIMA in April 2005, in connection with its opposition to Layton's motion to compel production, but those documents do not identify who he really was and the significant role he played in the downsizing of DIMA.

7

operation of DIMA" and "all of the wealth management groups" reported to him. Saltonstall dep., Day One, p. 34.

28. Thereafter, I scheduled Layton depositions of DIMA witnesses Nelund, to whom Saltonstall reported at DIMA, Kurt Miscinski, ("Miscinski") and Leo Grohowski ("Grohowski") to take place in New York (where the deponents worked for DIMA) on June 14 (Nelund) and June 15 (Miscinski) and June 16 (Grohowski).

29. However, on June 13, 2005, at about 5:30 p.m., the evening before the start of the Nelund deposition, DIMA counsel delivered to my office in New York a package of additional DIMA documents identified by DIMA counsel as a "supplemental production" of requested documents.

30. The "supplemental production" was a file of documents that Nelund testified in deposition the next morning that she had maintained and kept in her office files concerning the 2002 downsizing at DIMA.

31. In this file, I discovered a memorandum from one Leonard Dolan to Saltonstall (the "Dolan memorandum"), which Saltonstall had forwarded to Nelund, in which Dolan stressed his young age as a reason for him not to be terminated in the downsizing at DIMA.

32. The next morning, June 14, 2005, Nelund testified in deposition that DeWeck had determined the dollar amount of

      the cost reductions to be implemented within Deutschebank as a whole in 2002, including within the Private Wealth Management Group ($12-$15 million), of which the share of the Portfolio Managers was to be $5 million and that DeWeck had communicated these decisions to DIMA through another DIMA official Paul Higgins. Nelund dep., pp. 20-23. According to Nelund, DeWeck "established" the financial targets and "Paul [Higgins] would tell us." Nelund dep., pp 43-45. Higgins retired from DIMA as of January 1, 2003. Id.

33. Nelund testified further that, among the other 2002 downsizing related documents in the file she had just produced were evaluations of persons considered for termination as part of the downsizing.

34. Nelund also testified that she had never seen Layton's complaint in this case and that, because she had never been contacted concerning Layton's October 12, 2004, document request, she had never made a search for the documents identified in Layton's request for documents.

35. In an August 8, 2005, errata sheet, Nelund backtracked somewhat from her June 14, 2005, deposition testimony concerning document production, taking the position in the errata sheet, a copy of which is annexed hereto as Exhibit "B," that, "Upon further review, I understand that notice of this litigation was sent to me at various times." On June

21, 2004, notice was sent to me that DIMA's counsel was seeking copies of documents relevant to the case."

36. However, Nelund's errata sheet statement does not contradict her deposition testimony that she had not seen or been apprised of the content of Layton's October 12, 2004, request for production and had not searched her files for her 2002 DIMA downsizing file until she was about to be deposed on June 14, 2005.

37. On June 20, 2005, Layton served a second request for production of documents and a first set of interrogatories.

38. In the week of July 21, 2005, while awaiting the DIMA responses to Layton's June 20 document request and answers to his interrogatories, I had a discussion with DIMA counsel in which DIMA requested extensions of the time to produce the documents responsive to Layton's second request for production and to answer his interrogatories.

39. We also discussed extending the date for the completion of fact discovery, but DIMA refused to agree to any date after August 31, 2005.

40. In these discussions, I advised DIMA counsel that I planned on taking the deposition of the head of the DIMA Human Resources Department, one James Maloney ("Maloney") (who, like Higgins, but unlike DeWeck, had been identified the DIMA Initial Disclosures), and probably the depositions of

other DIMA related persons. I emphasized in these discussions that I did not intend to take those depositions before DIMA made complete and responsive document production, and served complete and responsive interrogatory answers.

41. In response, DIMA counsel (Attorney Krauss) suggested August 1, 2005, as a possible date for a Layton deposition of Maloney as she said, August 1, was "open" on Attorney Rubin's "calendar."

42. However, I made no agreement with, or otherwise committed to, her that I would proceed with an August 1 deposition of Maloney, particularly since at this time, DIMA had not produced the requested documents and had not served answers to the interrogatories.

43. Attorney Krauss again rejected my request for an agreement to extend expert disclosure deadlines.

44. On July 27, 2005, DIMA served a response, including objections, to Layton's June 20, 2005, second document request and objections and answers to the June 20, 2005, Layton interrogatories.

45. Because both discovery responses asserted various objections and were highly non-responsive and unhelpful, the responses were highly unsatisfactory and they caused me to reaffirm my decision not to take the Maloney deposition and those of

other DIMA related persons until I had received the requested documents and the answers to the interrogatories.

46. Because I had determined that a motion to compel production of documents and answers to the interrogatories would be necessary, I did not notice a deposition of Maloney for August 1; nor did I make any agreement with Attorney Krauss that, even in the absence of a notice for it, I wanted to proceed with a deposition of Maloney on August 1 or any other date unless I first received a full and complete production of documents and responsive answers to the interrogatories.

47. From Thursday evening, July 28, 2005, through Monday, August 1, 2005, I was out of the office because of a medical problem.

48. When I returned to the office on Tuesday, August 2, I learned for the first time that the day before (Monday, August 1), DIMA counsel (Attorney Rubin) had appeared at my office with Maloney.[5]

49. Thereupon, I had discussion with DIMA counsel (Attorney Rubin) and I expressed my apology for the misunderstanding about the taking of the Maloney deposition and I explained to him, as I had explained previously to Attorney Krauss,

---

[5] I also learned for the first time that day that on the preceding Friday Attorney Rubin had sent a fax to my office indicating his intent to appear at my office on Monday, August 1, with Maloney even though no notice for the deposition had been served.

12

that I was not going to take the Maloney or other DIMA related depositions until I had received the requested documents and the interrogatory answers.

50. Later that week, Attorney Rubin told me that DIMA was making an offer to settle this case and requested a demand from Layton.

51. I tried to communicate with Layton before I departed for a previously planned two week vacation out of the country, but was unable to reach him before I left.

52. During the week of August 22, 2005, after I returned from my vacation, I was able to discuss settlement with Layton and I telephoned Attorney Rubin to advise him of Layton's response to the DIMA settlement proposal, and to request a meeting in Boston during the week of August 29, 2005, when I was scheduled to be there on another matter. However, I was unable to talk to him as I was advised that he "out" this week and would be "out" the following week.

53. Because DIMA had initiated settlement negotiations, Layton and I decided that settlement should be explored fully before the cost, time and expense of motion practice and additional depositions were to be incurred.

54. In the September to October period, I spoke again with DIMA counsel concerning settlement, who reacted negatively to the Layton settlement demand, but asked for details as to the

aggregate amount of attorneys' fees incurred and, at the same time, disclosed that he (Attorney Rubin) had not initially extended the full limit of his authorization to settle. He requested that Layton reduce his settlement demand before DIMA would consider an increase in its settlement offer.

55. When I later reported to DIMA counsel that Layton did not wish to reduce his settlement demand, Attorney Rubin inquired if Layton would agree to mediation utilizing the JAMS office in Boston. I agreed to communicate DIMA's mediation proposal to Layton, who agreed to go forward with a JAMS mediation, provided that discovery would be stayed during this time frame.

56. On November 10, 11, 14 and 17, 2005, I negotiated with DIMA counsel the terms of a reference of the matter to mediation at JAMS and the terms of a joint motion to the court to stay discovery in order to proceed to mediation.

57. When, in these negotiations, DIMA counsel insisted on including in the motion to stay and reference to mediation January 17, 2006, as the date for the filing of a motion for summary judgment, I insisted that the court be advised in the motion of Layton's intent to file motions to compel discovery and for further discovery if the JAMS mediation did not resolve the case.

58. The parties' "Joint Motion for Referral to Non-binding Mediation was filed on November 18, 2005.

59. As allowed by the court on November 22, 2005, the Joint Motion recognized that, if mediation did not result in resolving the case, at least one of the parties intended to bring on before the court motions to compel discovery and to enlarge the time for completing discovery, by stating,

> During the mediation process, <u>all proceedings... shall be stayed</u>.
>
> <u>Neither party will be prejudiced by agreeing to mediate</u>. Specifically, <u>both parties reserve any rights or arguments they have as of this date, including any rights or arguments to raise or oppose motions to compel or modify time limits</u>.
>
> The deadline for filing dispositive motions,...shall be re-scheduled to January 17, 2006,. <u>This deadline, as well as subsequent scheduled events , may be subject to further re-scheduling depending upon the results of any motions contemplated in paragraph 4, above</u>.

    (Emphasis added.)

60. On December 12, 2005, mediation went forward before JAMS in Boston, but was unsuccessful. The mediator suggested a further session, but DIMA counsel indicated that he wished to confer with DIMA and that thereafter, he would contact Weir as to how to proceed. He did not do so.

61. On January 17, 2006, DIMA filed a motion for summary judgment. On February 16, 2006, Layton timely filed his opposition to the DIMA motion for summary judgment, contending, among other things, that he should be allowed relief under Fed. R. Civ. P. 56(f)

62. Because of the failures of DIMA to make discovery and produce documents in a proper and timely manner, a course of conduct that DIMA followed for many months in 2004 and 2005, Layton has been prevented by DIMA from obtaining documents and information necessary to conduct proper depositions of DeWeck and those other persons whom DIMA has identified as the persons it will call as witnesses at trial to support DIMA's claims and defenses. Layton also has been prevented from furnishing relevant documents to Layton's expert.

63. DIMA's delays and failures to make discovery have unduly prejudiced Layton's ability at this time to defend against the motion for summary judgment, to amend the complaint to assert a disparate impact claim under Smith, and to prepare for trial.

64. 65. In circumstances such as this, relief under Rule 56(f) should be granted to prevent a great injustice.

Signed under the penalty for perjury this 21st day of March 2006,

                              <u>/s/ John K. Weir</u>
                              John K. Weir, Admitted PHV
                              John K. Weir Law Offices, LLC
                              300 Park Avenue, Suite 1700
                              New York, New York, 10022
                              Tel.: 212.572.5374

                      <u>Certificate of Service</u>.

    This document, filed through the ECF System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

                              <u>/s/  Kevin F. Moloney</u>
                                  Kevin F. Moloney

Dated: March 21, 2006

[351600.1]