UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| John R. Layton, ) | BBO No. 351000 |
| ) | |
| Plaintiff, ) | Memorandum of Plaintiff Layton |
| ) | in Support of his Opposition to |
| v. ) | Defendant's Motion |
| ) | to Strike the O'Hara Affidavit and |
| Deutsche Investment Management ) | its Attached Exhibit 1 |
| Americas, Inc., ) | |
| ) | |
| Defendant. ) | |

Plaintiff John R. Layton ("Layton") submits this memorandum in support of his opposition to the motion of defendant Deutsche Investment Management Americas, Inc. ("DIMA") to "Strike Affidavit of David R. O'Hara and its Attached Exhibit 1" ("Motion to Strike").

1. Facts.

In his opposition ("Opposition") to DIMA's motion for summary judgment and in his Corrected Counter Statement of Relevant Facts ("Statement of Facts"), Layton, in part, relied upon the Affidavit of David R. O'Hara (the "O'Hara Affidavit") and its attached Exhibit 1 as evidence that the list of terminated DIMA employees provided to Layton by DIMA as Appendix A to its proposed letter agreement of November 19, 2002, was wrong:

> Layton quickly determined that the list was "not in accord with what was happening on the ground" because he had seen numerous people in Boston being fired for unknown reasons, and knew from attendance at "see you later" lunches, and from the handing out of money to "people whose jobs were taken away and who had sick spouses or what not", that Appendix A was wildly inaccurate, Layton dep., 147-52, in that it substantially understated the number of employees terminated at DIMA since the Deutsche Bank acquisition of Scudder in April 2002 almost all of whom Layton knew to be substantially over 40 years of age.

Statement of Facts, ¶79, citing O'Hara Affidavit, Exhibit 1; Layton dep., 94, 147-152.  Exhibit 1 to the O'Hara Affidavit consisted of three columns, showing the name of the DIMA employee terminated, the date of termination and a notation as to whether that employee had been employed by Scudder before the merger with DIMA in April 2002.

In the O'Hara Affidavit, O'Hara states that he has personal knowledge of the facts set forth therein; that he had been employed by Scudder as Vice President in the Equity Portfolio Systems from September 24, 1990, until April 7, 2002, and by DIMA, in its Equity Systems Group, as Vice President, from April 8, 2002, until June 30, 2003; that his job responsibilities while employed at both Scudder and DIMA required him "to become and remain informed of employee termination dates"; that he "had...personal knowledge of the employment termination dates of persons who, prior to the April 8, 2002, acquisition of Scudder by DIMA, were employed by Scudder, Deutsche Bank, DIMA or other Deutsche Bank affiliates and who, as of the April 8, 2002, acquisition of Scudder became or remained, as the case may be, employees of DIMA."  The O'Hara Affidavit states further that "[i]n or about July, 2003," O'Hara "provided a list of [those] persons (the "list"), and their respective termination dates to...Layton...," and that Exhibit 1 is a copy of that list.

2. <u>Argument</u>.

2.1 <u>The Exhibit 1 to the O'Hara Affidavit is not a stolen trade secret, and DIMA and its counsel should be sanctioned for asserting, without any factual support, and to gain tactical advantage in a civil action, that Layton and his counsel are guilty of criminal conduct</u>.

DIMA argues that Exhibit 1 was stolen by O'Hara, that he admits as much in his affidavit, and that Exhibit 1 constitutes a trade secret protected by Massachusetts G.L. c. 93, § 42, and that "Plaintiff is knowingly in receipt of stolen property," thus charging Layton with criminal conduct.  Motion to Strike, p. 2.  DIMA fails to submit any facts, by affidavit or otherwise, to support these outrageous claims.

O'Hara did <u>not</u> steal the list set forth in Exhibit 1, and nothing in his Affidavit indicates otherwise.  He merely states that he worked for Scudder and DIMA, that his job responsibilities required

2

him to be aware of the information contained in Exhibit 1, and that after he ceased working for DIMA, he provided Exhibit 1 to Layton. There is nothing in O'Hara's affidavit, or anything in the record of this case, to indicate that he stole the information or that he was not authorized to provide it to Layton. Notably, DIMA has not seen fit to submit any affidavit to support its outrageous claims.

Neither Exhibit 1, nor the individual items of information set forth therein, constitute trade secrets protected by c. 93, §42. First, the information contained in Exhibit 1 was not secret, but, in fact, was known publicly. There was nothing confidential about the fact that the employment of each of the persons on the list had terminated, the date on which it occurred, or whether each worker, before the merger, had worked for Scudder. Such information about the termination of any given employee was known not only to that employee, but to the employee's family and friends, to his or her co-workers, and to the DIMA clients and business contacts with whom that employee had worked and who necessarily had to have to been notified of the employee's departure from DIMA. As information about the termination of each employee was not secret, DIMA hardly can claim that Exhibit 1, which merely aggregated such information, was a trade secret.

Exhibit 1 also does not qualify as a trade secret because there is no admissible evidence that DIMA took the slightest precautions to safeguard the information. To establish that information is a trade secret, the party claiming such protection must prove that it took reasonable steps to preserve secrecy. As set forth in Baystate Technologies, Inc. v. Bently Systems, Inc., 946 F.Supp. 1079, 1091 (D. Mass. 1996), a case cited by DIMA,

> To demonstrate misappropriation of trade secrets under Massachusetts law, Baystate must prove: (1) the information in question is a trade secret, (2) Baystate took reasonable steps to preserve the secrecy of that information, and (3) Bently "used improper means, in breach of a confidential relationship, to acquire and use the trade secret.

(Emphasis added). See also Touchpoint Solutions, Inc. v. Eastman Kodak Co., 345 F.Supp.2d 23, 27 (D.Mass. 2004); USM Corp. v. Marson Fastener Corp., 379 Mass. 90, 97 (1979) ("One who possesses a

3

trade secret and wishes to protect it must act to preserve its secrecy"). In the present case, DIMA did nothing to protect the information set forth in Exhibit 1.

Even had DIMA attempted to protect the information, Exhibit 1 still would not constitute a trade secret because the information it contains is not the type of information that would give DIMA a competitive advantage in the marketplace. In Dynamics Research Corp. v. Analytic Sciences Corp., 9 Mass. App. Ct. 254, 273 n. 23 (1980), the Massachusetts Appeals Court explained:

> Not every commercial secret, however, qualifies as a trade secret. It is well known that in business most matters are considered as confidential; however, only secrets affording a demonstrable competitive advantage may be properly considered as trade secrets.

Id. at 273 n.23, quoting 12 Business Organizations, Milgrim, Trade Secrets (Milgrim) s 2.03 (1978). (Emphasis added.) See also Touchpoint Solutions, Inc. v. Eastman Kodak Co., 345 F.Supp.2d at 27; Foster-Miller, Inc. v. Babcock & Wilcox Canada, 975 F.Supp. 30, 33-34 (D. Mass. 1997). Jet Spray Cooler v. Crampton, 377 Mass. 159, 169 (1979), a case cited by DIMA, states the same requirement. Despite this clear requirement, DIMA has submitted no evidence of how maintaining secrecy concerning employment terminations would give it any competitive advantage in the investment industry.

By claiming that Layton is "knowingly in receipt of stolen property," DIMA overtly accuses its adversary of criminal conduct, yet offers no factual basis for these serious charges. Not only is such a charge defamation per se[1], it is unethical conduct on the part of an attorney. Massachusetts Rule of Professional Conduct 3.4 states that "a lawyer shall not: ... (h) present, participate in presenting, or threaten to present criminal or disciplinary charges solely to obtain an advantage in a private civil matter...." The court should impose appropriate sanctions.

    2.2    The O'Hara Affidavit is relevant and admissible.

---

[1] Draghetti v. Chmielewski, 416 Mass. 808, 812 (Mass. 1994).

DIMA makes a number of less than convincing arguments as to why the O'Hara Affidavit and Exhibit 1 are inadmissible. Yet it should be noted, at the outset, that DIMA never asserts that the facts set forth in Exhibit 1 are anything other than entirely correct.

Asserting that "there is no showing that O'Hara has personal knowledge that the individuals listed on Exhibit 1 ended their employment with DIMA" and that he obtained that information from another person with knowledge, DIMA claims that the O'Hara Affidavit should be excluded as hearsay not within any exception. That is incorrect. O'Hara expressly states that he has "personal knowledge of the facts set forth" therein. DIMA has not submitted any evidence to the contrary, by affidavit or otherwise.

Even if Exhibit 1 were hearsay, it is admissible because it falls within one or more of the exceptions to the hearsay rule under the Federal Rules of Evidence. O'Hara testified that it was one of his job responsibilities to "to become and remain informed of employee termination dates". He therefore acquired the information in Exhibit 1 in the ordinary course of DIMA's business and for DIMA's business purposes. Moreover, while he provided Exhibit 1 to Layton after O'Hara had ceased working for DIMA, the most reasonable inference is that he prepared and maintained the list of terminated employees while working for DIMA and close to the time of the respective terminations. These facts bring Exhibit 1 within the business records exception to the hearsay rule, Fed. R. Evid. 803(6). Moreover, even if Rule 803(6) does not apply, the foregoing facts, in combination with the fact that DIMA does not dispute the accuracy of the information in Exhibit 1 and the fact that O'Hara has no personal interest in this case, constitute "equivalent circumstantial guarantees of trustworthiness" warranting the application of the residual hearsay exception, Fed. R. Evid. 807.

DIMA also asserts that "the timing and the circumstances of O'Hara's disclosure of Exhibit 1 to Plaintiff make him incompetent to testify as to its contents." It is not at all clear what DIMA means by this statement, a problem made worse by DIMA's failure to cite any case law in support of its position. O'Hara clearly is competent to testify as to the contents of a document that he created. To the extent

that the cryptic phrase "the timing and the circumstances" refers to the allegation that O'Hara stole a trade secret, DIMA's claim lacks any merit for the reasons discussed in §2.1, above.

The court also should reject DIMA's claim that Exhibit 1 and the O'Hara Affidavit lack an adequate foundation. DIMA stresses that Exhibit 1 had "no title or other heading" and that nothing "on the document itself or in the O'Hara Affidavit explains how Exhibit 1 was authored or created." However, the lack of a title or heading does not matter, as O'Hara explains the purpose and meaning of Exhibit 1 in his affidavit. Similarly, the O'Hara Affidavit makes clear that O'Hara created Exhibit 1, based on his own personal knowledge. O'Hara, as the person who created Exhibit 1 of his own personal knowledge, is the person best able to provide a foundation for the admissibility of Exhibit 1.

DIMA also claims that Exhibit 1 is irrelevant because it fails to state whether the employees listed left DIMA voluntarily or involuntarily or were fired for cause or as part of a reduction in force, and fails to state the ages of the listed employees or what DIMA divisions they worked in. While Layton admits that evidence of terminations of other employees for cause, of voluntary departures, or of terminations of persons under 40 would not be relevant to his ADEA claims, Layton did not rely on the O'Hara Affidavit or on Exhibit 1 to provide information about the circumstances under which employees left DIMA or their ages. Paragraph 79 of Layton's Statement of Facts cites the O'Hara Affidavit and Exhibit 1 only for the fact that DIMA had "substantially understated the number of employees terminated at DIMA since the Deutsche Bank acquisition of Scudder in April 2002." Other facts with regard to the ages of the persons terminated, and the circumstances of their terminations were based on Layton's personal knowledge, not the O'Hara Affidavit or Exhibit 1:

> <u>Layton</u> quickly determined that the list was "not in accord with what was happening on the ground" because he <u>had seen numerous people in Boston being fired for unknown reasons, and knew from attendance at "see you later" lunches' and from the handing out of money to "people whose jobs were taken away and who had sick spouses or what not</u>", that Appendix A was wildly inaccurate, Layton dep., 147-52, in that it substantially understated the number of employees terminated at DIMA since the Deutsche Bank

acquisition of Scudder in April 2002 almost all of whom <u>Layton knew to be substantially over 40 years of age</u>.

(Emphasis added).

DIMA claims that the Exhibit 1 is irrelevant because it concerns employee terminations other than on November 19, 2002. However, a larger group of employee terminations is relevant to this case. Layton seeks information concerning terminations from April 8, 2002, the date of the merger through December 31, 2002, all of which are relevant to Layton's disparate impact claim. In his second request for production of documents, filed June 20, 2005, Layton sought information relative to 25 employee terminations during the relevant time period. DIMA failed to provide any meaningful response, and Layton now seeks to file a motion to compel. DIMA cannot reasonably assert that information on Exhibit 1 about employment terminations in the April 8, 2002, to December 31, 2002, time period is irrelevant because no disparate impact claim is in the complaint, where it is DIMA's failure to make discovery which has prevented Layton from obtaining the factual support necessary to add such a claim. Under the circumstances of this case, the court would be well within its rights to allow, as Layton has requested, discovery of information and documents relevant to the subject matter of this case, as Rule 26 provides.

3. <u>Conclusion</u>.

For all of the foregoing reasons, the court should deny DIMA's Motion to Strike.

<u>Request for Hearing and Oral Argument</u>.

Layton requests a hearing and oral argument on DIMA's motion to strike the O'Hara Affidavit and attached Exhibit 1.

                                       JOHN R. LAYTON, plaintiff,

                                       By his attorneys,

                                       BARRON & STADFELD, P.C.

                                       <u>/s/ Kevin F. Moloney</u>
                                       Kevin F. Moloney    BBO No. 351000

        Roger T. Manwaring  BBO No. 548614
        100 Cambridge Street, Suite 1310
        Boston, Massachusetts 02114
        Tel.: 617.531.6569

        and

        /s/ John K. Weir
        John K. Weir, admitted PHV
        John K. Weir Law Offices, LLC
        300 Park Avenue, Suite 1700
        New York, New York 10022
        Tel.: 212.572.6374

Dated: March 21, 2006.

<u>Certificate of Service</u>.

This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

        /s/ Kevin F. Moloney

Dated: March 21, 2006.

[351163.1]